### In re MISSOURI PAC. R. CO.

No. 6935.

District Court, E. D. Missouri, E. D.
July 29, 1943.

Alexander & Green, of New York City, for Bankers Trust Co. and others.

Chadbourne, Wallace, Parke & Whiteside, of New York City, for Manufacturers Trust Co.

Jeffries, Simpson & Plummer, of St. Louis, Mo., for Benj. F. Edwards.

W. Lloyd Kitchel, of New York City, for Bondholders Protective Committee.

White & Case, of New York City, for Bankers Trust Co.

Larkin, Rathbone & Perry, of New York City, for Central Hanover Bank & Trust Co.

Cravath, de Gersdorff, Swaine & Wood, of New York City, for Bondholders Protective Committee, New Orleans, T. & M. Ry. Co. first mortgage.

T. M. Pierce and S. Mayner Wallace, both of St. Louis, Mo., for Mississippi Valley Trust Co. and Bondholders' Protective Committee, New Orleans, T. & M. Ry. Co. First Mortgage.

Cassius M. Clay, of Washington, D. C., for Reconstruction Finance Corporation.

Ernest S. Ballard, of Chicago, Ill., and Marion B. Pierce, of New York City, for Missouri Pac. R. Co., debtor.

Shearman & Sterling, of New York City, for Bondholders Protective Committee, Missouri Pacific Railroad Co. General Mortgage.

Root, Clark, Buckner & Ballantine, of New York City, for Commercial Nat. Bank & Trust Co. of New York.

Milbank, Tweed & Hope, of New York City, for City Bank Farmers Trust Co., and another.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City, for Guaranty Trust Co. of New York.

Miller, Owen, Otis & Bailly, of New York City, for New York Trust Co.

Bryan, Williams, Cave & McPheeters, of St. Louis Mo., for St. Louis Union Trust Co., and another.

Wright, Gordon, Zachry & Parlin, of New York City, for Chemical Bank & Trust Co.

Winthrop, Stimson, Putnam & Roberts, of New York City, for Bankers Trust Co.

A. L. Rittenberg, of Chicago, Ill., for M. Ernest Greenebaum, Jr., and another.

Oliver & Donnally, of Washington, D. C., for Savings Bank Trust Co.

Daniel Willard, Jr., of Washington, D. C., for Railroad Credit Corporation.

Luther M. Walter, of Chicago, Ill., for Protective Committee for holders of Missouri Pacific common stock.

Emmet D. Borden, of Washington, D. C., for Missouri overcharge claimants.

Kurzman & Frank, of New York City, for executors of estate of J. F. Dewald.

Lord, Day & Lord, of New York City, for Corn Products Refining Co. et al.

John S. Burchmore, of Chicago Ill., for R. W. Higgins.

Chas. H. Griffiths, of New York City, for Cornelius C. Kroll et al.

Hennings, Green, Henry & Hennings, of St. Louis, Mo., for Reconstruction Finance Corporation.

Russell L. Dearmont, of St. Louis, Mo., for Guy A. Thompson.

Davies, Auerbach, Cornell & Hardy, of New York City, for Irving Trust Co., as trustee under the New Orleans, Texas & Mexico Railway First Mortgage.

Donovan, Leisure, Newton & Lumbard, of New York City, for Alleghany Corporation.

MOORE, District Judge.

The plan for the reorganization of the Missouri Pacific Railroad Company and its subsidiaries is before this Court for the second time. On July 12, 1941, we entered an order approving the plan which had been certified by the Interstate Commerce Commission and overruling objections to the plan which had been duly presented here. The dissatisfied interests thereupon took appeals to the Circuit Court of Appeals for the Eighth Circuit.

On October 9, 1941, the Commission ordered the plan submitted to a vote, as is contemplated by subsection e of Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, sub. e. which governs these proceedings. Votes were cast by creditors on November 19, 1941, and on March 28, 1942, the Commission certified the results of the balloting, showing that not every class of creditors approved the plan by a favorable vote of at least two-thirds in amount of allowed claims of each class. In fact, in each of six of the total of sixteen classes voting, a majority voted against the plan.

Appeals were argued and briefs submitted to the Circuit Court of Appeals, but no ruling on the merits of the objections was made by that Court. The Supreme Court had granted certiorari in the matters of the reorganization of the Western Pacific Railroad Company, Ecker v. Western Pacific Railroad Co., 316 U.S. 654, 62 S.Ct. 1038, 86 L.Ed. 1734, and the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 316 U.S. 659, 62 S.Ct. 1302, 1303, 1304, 86 L.Ed. 1737. While the Missouri Pacific matter was pending in the Circuit Court of Appeals, the two above mentioned cases were argued and submitted to the Supreme Court, which handed down its decisions on March 15, 1943, Group of Institutional Investors et al. v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., et al., 63 S.Ct. 727, 87 L. Ed. ——; Ecker et al. v. Western Pacific Railroad Corp., et al., 63 S.Ct. 692, 87 L.Ed. ——. It was then deemed expedient to have the Missouri Pacific matter reconsidered here, and the Circuit Court of Appeals, by its order of May 8, 1943, remanded the appeals to this Court. Further specific objections were then filed in this Court and a hearing on those objections was had on July 16, 1943.

Our opinion on our first disposition of the plan, reported at In re Missouri Pac. R. Co., 39 F.Supp. 436, contains a brief historical survey of this matter from the time debtor's petition was filed, March 31, 1933, to the date of the opinion, June 20, 1941, as well as a discussion of the debtor's affairs and the features of the plan, none of which need be repeated here; nor do we find it necessary to retract any of our former views in order to conform to the opinions of the Supreme Court in the Western Pacific and Milwaukee decisions, supra. The matters now before the Court result from intelligence gained since our first disposition of the matter and were not before us at that time.

Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, subsection e, provides: "Upon the certification of a plan by the Commission to the court, the court shall give due notice to all parties in interest of the time within which such parties may file with the court their objections to such plan, and such parties shall file, within such time as may be fixed in said notice, detailed and specific objections in writing to the plan and their claims for equitable treatment. The judge shall, after notice in such manner as he may determine to the debtor, its trustee or trustees, stockholders, creditors, and the Commission, hear all parties in in-

terest in support of, and in opposition to, such objections to the plan and such claims for equitable treatment. After such hearing, and without any hearing if no objections are filed, the judge shall approve the plan if satisfied that: (1) It complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; (2) the approximate amounts to be paid by the debtor, or by any corporation or corporations acquiring the debtor's assets, for expenses and fees incident to the reorganization, have been fully disclosed so far as they can be ascertained at the date of such hearing, are reasonable, are within such maximum limits as are fixed by the Commission, and are within such maximum limits to be subject to the approval of the judge; (3) the plan provides for the payment of all costs of administration and all other allowances made or to be made by the judge, except that allowances provided for in subsection (c), paragraph (12) of this section, may be paid in securities provided for in the plan if those entitled thereto will accept such payment, and the judge is hereby given power to approve the same."

■ The first objection is based on the rule announced by Mr. Justice Douglas in the Milwaukee case, supra, that where a senior lienor receives securities in reorganization, including junior securities, of the face amount of his former lien, and junior lienors likewise participate in the reorganization plan, then the senior lienor must be given something additional to fully compensate him for his loss of seniority. And it was further held that it is the duty of the Interstate Commerce Commission and the District Court to weigh the value of the new securities given the senior lienor and determine whether in the matter of increased participation in earnings, assets or control, they yield valuable new rights which are sufficient to compensate the senior lienor for his loss of seniority. Under the old equity practice which antedates Section 77, the "full priority" rule was announced in the case of Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931. This rule was incorporated in Section 77B of the Bankruptcy Act, 11

U.S.C.A. § 207; Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982; Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S. Ct. 1, 84 L.Ed. 110. In the Milwaukee opinion, supra, Mr. Justice Douglas stated, loc. cit. 751 of 63 S.Ct., 87 L.Ed. ——:

"The rule of the Boyd case 'protects the rights of senior creditors against dilution either by junior creditors or by equity interests.' Marine Harbor Properties, Inc. v. Manufacturer's Trust Co., supra (317 U.S. 87, 63 S.Ct. 98, 87 L.Ed. ——). That view has not been contested here. Hence, as we indicated in the Consolidated Rock Products case, where junior interests participate in a plan and where the senior creditors are allotted only a face amount of inferior securities equal to the face amount of their claims, they 'must receive, in addition, compensation for the senior rights which they are to surrender.' 312 U.S. 529, 61 S.Ct. 686, 84 L.Ed. 110. And we stated that whether they should 'be made whole for the change in or loss of their seniority by an increased participation in assets, in earnings or in control, or in any combination thereof, will be dependent on the facts and requirements of each case.' Id., 312 U.S. page 529, 61 S.Ct. page 686. We felt that result was made necessary by the ruling in the Boyd case that, 'If the value of the road justified the issuance of stock in exchange for old shares, the creditors were entitled to the benefit of that value, whether it was present or prospective, for dividends or only for purposes of control.' 228 U.S. page 508, 33 S.Ct. page 561, 57 L.Ed. 931. We adhere to that view. Unless that principle is respected, there will be serious invasions of the rights of senior claimants to the benefit of junior interests. The property of one group will be subtly appropriated to pay the claims of another while lip service is rendered the principles of priority.

"Some argument is advanced that under this plan the General Mortgage bondholders do receive as against the junior interests compensatory treatment which is adequate to make up for the seniority rights which they are to surrender. * * *

"But neither the Commission nor the District Court considered the problem. As we have indicated, the question whether senior creditors have received 'full compensatory treatment' rests in the informed judgment of the Commission and the Court. A decision on that issue involves

a consideration of the numerous investment features of the old and new securities and a financial analysis of many factors. * * * Our conclusion on the point is that, since junior interests are participating in the plan, the Commission and the District Court should determine what the General Mortgage bonds should receive in addition to a face amount of inferior securities equal to the face amount of their old ones, as equitable compensation, qualitative or quantitative, for the loss of their senior rights."

■ In behalf of holders of Missouri Pacific Railroad Company First and Refunding Mortgage Bonds and holders of First Mortgage Bonds and Income Bonds of New Orleans, Texas and Mexico Railway Company, it is contended that each of them has lost seniority rights under the plan formulated by the Commission, and that the question as to whether there has been full compensation for such loss has not been considered. We think this is true.

In the Commission's Report, Finance Docket No. 9918, Missouri Pacific Railroad Company Reorganization, the Commission described the lien of the Missouri Pacific First and Refunding Mortgage Bonds (p. 12027 et seq. of the permanent record of the reorganization proceedings): "The bonds are secured by a first lien on about 5,400 miles of railroad of the Missouri Pacific Railroad Company and have also a lien on some 1,200 miles subject to the prior liens of about $50,000,000 of bonds secured by the various underlying mortgages. They are also secured by a first lien upon practically all the equipment owned by the Missouri Pacific, and are secured by the debtor's equity in all equipment now subject to equipment trust. They are further secured by various collateral, the most important of which consist of 2,851 shares of the capital stock of the American Refrigerator Transit Company, about 57 percent of the outstanding stock of that company, and 237,030 shares, being the entire issue, of the 5-percent non-cumulative preferred stock of the Texas & Pacific Railway Company, the dividend on which has been earned since 1935, and is being currently paid."

Discussing the allocation of securities in the new company, the Commission stated in its report (p. 12194 of the permanent record):

"The claim of holders of Missouri Pacific Railroad Company first and refunding mortgage 5 percent bonds of 1965-81 constitutes by far the largest class in total amount of creditors in this proceeding. As of January 1, 1940, the total of the claim was $295,134,203. The lien of the mortgage securing these bonds has been hereinbefore described. Within the limitations of the permissible capitalization of the new company and total issuable amounts of the several kinds of new securities as determined herein and in view of the permissible capitalization found by us for the Missouri Pacific Railroad Company, and the requirements for satisfaction of other claims having prior or equal liens against the property, it is necessary that the first and refunding bondholders, in order that they may receive the full recognition of their claim to which they are entitled, receive some new securities of each class provided for under our plan (excepting the 10-year notes and series-A first-mortgage bonds, whch are to be used exclusively in satisfaction of prior claims or claims entitled to special treatment as heretofore described.)"

"The amount of each new class of security which should be allocated to the first and refunding mortgage bondholders has been developed on the record as a matter for the exercise of judgment based principally upon a consideration of the relative treatment that should be accorded the first and refunding mortgage bondholders, the New Orleans first mortgage and income mortgage bondholders, and the International first mortgage bondholders."

According to the plan of reorganization, holders of the Missouri Pacific first and refunding bonds are to get approximately 30% of first mortgage bonds in the new company and the remainder in various classes of inferior securities, including preferred and common stocks, and junior lienors likewise participate in the reorganization. It does not appear from the Commission's report that it has considered the question of full priority treatment from the viewpoint decreed by the Supreme Court in the Milwaukee case, supra. Since treatment of the reorganization plan lies in the first instance with the Commission, it is therefore necessary in accordance with the provisions of subsection e of Section 77 to refer the matter back to the Commission for further consideration.

A detailed examination of the objection of the New Orleans, Texas and Mexico bondholders will not be necessary here, but it is sufficient to say that their situation is

in all respects similar to that of the Missouri Pacific first and refunding group, and consideration must likewise be given to their plea for full priority treatment.

■ In behalf of other bondholders, junior to those mentioned above, but senior to other claimants participating in the reorganization, it is contended that the rule of full priority treatment applies to them, in turn, after full compensation has been made to underlying liens. These objectors are the first-mortgage bondholders of the International Great Northern Railroad Company. We think the sense of the Boyd, Consolidated Rock Products, Western Pacific and Milwaukee cases, supra, is that a correct application of the rule of full priority treatment requires a recognition of the right these bondholders contend for. In other words, a lienor having prime seniority must receive full compensation including compensation for lost seniority before anything can be given to lienors having secondary seniority. Then, if any assets remain, the liens of secondary seniority must be fully compensated for, including compensation for lost seniority, before anything can be given to lienors having tertiary seniority. And so on down the line.

■ It might be well to point out, however, that nothing in the Milwaukee case indicates that new securities in face amount greater than the face amount of the retired lien need be allocated in order to give full compensation. The Milwaukee opinion, loc. cit. 751 of 63 S.Ct., 87 L.Ed. ——, states that compensation for lost seniority may consist of "increased participation in assets, in earnings or in control". Thus a senior lienor, having been deprived of his full seniority in a reorganization plan, may receive a mixture of senior and junior securities in the new company, equal to the bare face value of his claim, and yet have been fully compensated for his loss of seniority by increased participation in earnings or control.

■ All interested parties in this matter seem to be in agreement on the second objection, that changed conditions since the plan was formulated now make it inequitable. The revenues and earnings of this road, like others, has increased tremendously during the past few years, resulting in a sizable increment of cash. As of June 30, 1943, the system's balance sheet showed cash items of $125,195,562.64. On December 31, 1939, just a short time prior to the effective date of the plan under consideration, the amount was $16,326,749.37; that was considered by the Commission to represent the bare minimum of working capital needed by the system. Thus there has been an increase of $108,868,813.27 during the period noted. Even after setting aside a working fund and reserves for taxes and other deferred charges, $57,822,419 of the amount on hand remains, clear and unencumbered, and in excess of debtor's business needs. In other words, a surplus of over 10% of the proposed capitalization of $560,000,000 would accrue to the new stockholders if the plan of reorganization were consummated now. Debtor's assets, according to its balance sheets, have increased from $796,522,113 on December 31, 1939, to $932,171,782 on April 30, 1943, an increase of $135,649,569 for approximately the same period as noted above. At the same time, there have been substantial additions to the railroad plant in the way of Additions and Betterments, representing an investment of over $48,000,000 since 1938.

Greatly increased earnings were realized by both the Western Pacific and Milwaukee roads pending final hearings on their respective plans of reorganization, and in each case objections were raised because of that circumstance. Nevertheless, the respective District Courts having jurisdiction of those reorganizations refused to send the plans back to the Interstate Commerce Commission and these rulings were upheld on review. In the case before us, however, we are viewing the situation at a later date and the record presents a much stronger case in favor of the objectors than was true in either the Western Pacific or Milwaukee cases.

Evidence in the Milwaukee case brought the record on cash and earnings down through the year 1941, and while the most recent years showed earnings far in excess of what the Commission had determined to be a 'normal' year, these earnings did not equal the best year in the company's history, nor does it appear from the facts stated in the opinion that the cash items, at the time of the hearing, bulked as large in proportion to the proposed capitalization as is the case with the Missouri Pacific.

The record in the Western Pacific case was brought down through November, 1942. It was shown that earnings sufficient to pay all charges and allow a $3 dividend on the new common stock had been realized

in 1942 by only seven months operations, but on the other hand had been attained in only three other years of the road's entire history.

In the Missouri Pacific matter, we are able to view affairs from the perspective of 1943, and we find that cash has continued to accumulate at an unusual rate. With due respect to the Interstate Commerce Commission and its meticulous study of this railroad system, we believe that operations on the present scale were not envisioned in its picture of this system's affairs. The Commission's study of earnings available for fixed charges in past years covered the years 1925 to 1936, inclusive. The largest earnings during that period were realized in the year 1929, amounting to slightly over 34 million dollars. (To present the full picture, we will note that earnings sank below 6 million dollars in 1935, and that from 1931 to 1940, earnings were insufficient to meet all fixed charges.) Comparable figures for recent years show earnings in excess of 30 million for the year 1941, over 66 million for the year 1942 and slightly more than 24 million for the first five months of 1943 (yielding a rough estimate of some 57 million for the entire year of 1943). The Commission's estimated 'normal' year is a little over 22 million dollars. Looking at the figures for total railway operating revenue, which would be some 129 million in a 'normal' year according to the Commission's estimate, we find that 1941 yielded 144 million dollars; 1942, 231 million dollars; an estimated 271 millions in 1943 and about the same in 1944. (The estimates issued from the debtor's Trustee.) At the same time, the railway operating ratio, which is the ratio of total railway operating expense to the above figure, stood at 68.99 in 1941, 56.74 in 1942 and 52.16 for the first five months of 1943, indicating more profitable operations in each successive period.

While it was held in the Western Pacific case, supra, that the Commission need not indulge the presumption that the road will ever enjoy traffic in such volume as to use the full extent of its facilities, nevertheless when we are faced with the established fact that something closely approaching this situation has been attained, and has resulted in a large accumulation of surplus cash, we believe that that circumstance should be taken into account in determining whether a reorganization plan should not be revised in view of changed conditions arising since the formulation of the plan, in order to be fair and equitable as those terms are understood in law.

The Commission's own report indicates that its judgment would have been different had it been in a position to make use of cash in the amount now available. Referring to five underlying bond issues which had matured in 1938 and on which current interest was being paid at the time of the hearing before the Commission, it said (Permanent Record, p. 12163): "* * * there appears to be no doubt that these obligations, matured in 1938, are entitled to cash payment, or as near to its equivalent as is practicable."

The issues referred to are the Pacific Railroad Company of Missouri first-mortgage 3-percent bonds in the amount of $6,996,000; Pacific Railroad Company of Missouri Carondelet branch first-mortgage 4½-percent bonds in the amount of $238,-000; Pacific Railroad Company of Missouri second-mortgage 5 per cent bonds in the amount of $2,573,000; Missouri Pacific Railway Company third-mortgage 4 per cent bonds in the amount of $3,828,-000; and Pacific Railroad Company of Missouri real-estate mortgage. 5 per cent bonds in the amount of $799,000. An issue of collateral-trust 10-year notes, bearing 3½ per cent, in the amount of $14,434,-000 was provided to liquidate these five underlying bond issues. The language quoted above suggests that these issues would have been paid off in cash if it had been available in sufficient amount at the time the plan was formulated.

Likewise, provision was made for the issuance of securities to reimburse the Reconstruction Finance Corporation and J. P. Morgan and Company for money loaned, but it was contemplated that these claims should be diminished as much as possible pending consummation of a plan of reorganization. There is a strong likelihood that here too, cash, if available, would have been used to liquidate claims.

It appears, therefore, that if the Commission is still of the same opinion, the accumulated cash might well be used to liquidate some or all of these especially preferred claims. Since full priority treatment of senior lienors may involve the allocation of additional securities to those groups, that may then be accomplished without disturbing the proposed financial structure to the extent that might have been necessary had this cash not been available.

■■ We think the Commission might also consider the record of the past few years, if its best judgment so dictates, as bearing on a possible revision of the system's valuation. Recent earnings, together with the present enhanced value of the road, might justify a higher valuation of the property, and at the same time be compatible with the public interest. Valuation is, of course, a matter entirely within the jurisdiction of the Interstate Commerce Commission, provided only that proper legal criteria are used.

■■ Another objection urged, this in behalf of the debtor, is that the dissent of a majority of each of six out of sixteen groups of creditors voting on the plan requires this Court as a matter of law to refer the matter back to the Commission. The theory of this argument is that the provisions of Section 77, subsection e, relative to approval of a reorganization plan when two-thirds of each group of creditors is in accord, contemplate a means for effecting a reorganization over the obstructing tactics of a dissenting minority. But it is said that the section also contemplates that "arbitrary compulsion of plans over the dissents of the interested classes is not intended, nor is it believed that the courts will override dissents by any large number of such classes, or by a single large class, excepting where it is established that they have no interest in the property * * *". The quotation is from a statement by the then Federal Co-Ordinator of Railroads filed with the House and Senate referring to the bill drafted under his supervision and which later emerged as Section 77 of the Bankruptcy Act. This is cited as part of the legislative history of the act, said to have great persuasive force in its interpretation. Such interpretation should be resorted to, however, only where a statute is ambiguous. United States v. Standard Brewery, Inc., 251 U.S. 210, 40 S.Ct. 139, 64 L.Ed. 229. Helvering v. New York Trust Co., 292 U.S. 455, 54 S.Ct. 806, 78 L.Ed. 1361. And in view of the great stress on the public's interest in railroad reorganizations, expressed in the Western Pacific and Milwaukee cases, supra, we do not feel constrained at this time to rule that a plan of reorganization may not be confirmed over the objections of a majority of one or more classes of creditors. We can conceive of a situation where one or more classes of creditors would vote against a plan even though it had met all

legal requirements including those of fairness and equity. According to the contention here made, the Court cannot override the creditor's veto and the reorganization process might then be continued indefinitely and perhaps forever. This is not to be countenanced. Against the public interest, even a large group of creditors may be considered to be but a dissident and obstructive minority. Of course, in the event of such an impasse, the Court might dismiss the proceedings, but this is discretionary and need not be resorted to where a fair plan is produced.

However, it is readily conceded that if substantial agreement can be had, a more desirable end will have been reached. For other reasons, stated above, we must refer this matter back to the Interstate Commerce Commission. It is alleged by certain of the parties appearing here that a compromise plan has now been contrived which will meet the approval of substantially all the parties. Other interests have taken exception to this statement. Nevertheless, if a close approach to unanimity among the groups can be had on the compromise plan, and if the Commission finds that the public interest will be served by such a plan, unquestionably that would offer the best solution to the problem.

■■ There is one small point remaining, which perhaps requires comment. The Western Pacific and Milwaukee cases, supra, have held that the Commission may fix a date, other than the date of debtor's petition, as the effective date of a plan. In view of the lapse of time since the present plan was certified to this Court by the Commission, it would be well, we think, to fix another effective date when a plan is again certified, regardless of what other changes are made by the Commission.

For the reason that no consideration has been given by the Commission to compensation for loss of seniority rights, and for the further reason that changed conditions arising since the formulation of the Plan make it desirable that the Commission should have further opportunity to consider whether the Plan as formulated can be improved upon at this time, the Plan of Reorganization certified to this Court on April 9, 1940, is referred back to the Interstate Commerce Commission, together with the record and all of the papers forwarded by the Commission to this Court with the Plan, to be further considered.