In re MISSOURI PAC. R. CO.

No. 6935.

United States District Court,
E. D. Missouri, E. D.

July 29, 1950.

As Amended Oct. 3, 1950.

Russell L. Dearmont and Thomas T. Railey, St. Louis, Mo., for Guy A. Thompson, trustee, Missouri Pac. R. Co.

Marion B. Pierce, New York City, and Oliver & Oliver, Cape Girardeau, Mo., for Missouri Pac. R. Co. debtor.

Chadbourne, Wallace, Parke & Whiteside, New York City and Leonard P. Moore and Clair B. Hughes, New York City, of counsel, for Manufacturers Trust Co., as corporate trustee under the First & Refunding Mortgage of Missouri Pac. R. Co.

Dorr, Hammond, Hand & Dawson, New York City, and Carter, Bull & McNulty, St. Louis, Mo., and Emmet McCaffery, New York City, and Emmet Carter, St. Louis, Mo., of counsel, for Chemical Bank & Trust Co., as trustee, etc.

Cadwalader, Wickersham & Taft, New York City, and Lowenhaupt, Waite, Chasnoff & Stolar, St. Louis, Mo., and Charles W. McConaughy, and Morris D. Crawford, Jr., New York City, of counsel, and Jacob Chasnoff, St. Louis, Mo., of counsel, for Group of Institutional Investors Holding First & Refunding Mortgage 5% Bonds of Missouri Pac. R. Co.

Forest P. Tralles, Tralles, Hoffmeister & Gilpin, St. Louis, Mo., and Carl H. McClure, III, Putney, Twombly, Hall & Skidmore, New York City, of counsel, for Protective Committee for Holders of Missouri Pac. R. Co. 5¼ percent Secured Serial Gold Bond.

Forest P. Tralles, Tralles, Hoffmeister & Gilpin, St. Louis, Mo., and DeLancey C. Smith, San Francisco, Cal., for Avery Brundage and others, as stockholders of New Orleans, Texas & Mexico Ry. Co.

Forest P. Tralles, Tralles, Hoffmeister & Gilpin, St. Louis, Mo., and Willard P. Scott, Oliver & Donnally, New York City, for John Speed Elliott.

Harry Kirshbaum, New York City, and Edwin J. Bean, St. Louis, Mo., for Convertible Bondholders Group.

Everett Paul Griffin, St. Louis, Mo., Edward F. Colladay, Washington, D.C., and Kenneth McEwen, New York City, for Protective Committee of First Mortgage Bondholders of International-Great Northern R. Co.

Lucien Hilmer, Washington, D.C., for John V. Farwell, III, Bolton Sullivan and

Donald D. Wilson, independent directors of Missouri Pac. R. Co.

Wm. H. Biggs, Biggs, Curtis & Crossen, St. Louis, Mo., for Missouri Pac. R. Co. 5¼ Secured Serial Bondholders Committee, and as attorney for Helen J. Comstock.

William H. Biggs, St. Louis, Mo., for Andrew W. Comstock, and others, holders of 5⅛% Secured Serial Bonds.

Helen W. Munsert, Chicago, Ill., for Protective Committee for Holders of Common Stock of Missouri Pac. R. Co.

Abraham K. Weber, New York City, and Murphy & Bloom, St. Louis, Mo., for Carl Rosenberger, etc., Holders of IGN Adjustment 6s 52.

Adrian L. Foley and Edmund O'Hare, New York City, and White & Case, New York City, of counsel, for Alleghany Corp.

Owen D. Nee, New York City, and Root, Ballantine, Harlan, Bushby & Palmer, New York City, and William P. Palmer and Philip E. Gregg, New York City, of counsel, for Commercial Nat. Bank & Trust Co. of New York, as trustee for the debtor's 5½% Convertible Gold Bonds.

Price Daniel, Atty. Gen. of Texas, Charles D. Mathews, Asst. Atty. Gen. of Texas, and C. K. Richards, Asst. Atty. Gen. of Texas, for State of Texas and Railroad Commission of Texas, defendant intervenors.

Edward M. Boyne, Willkie Owen, Farr, Gallagher & Walton, and Leslie Craven, New York City, for New York Trust Co., trustee, International Great Northern Adjustment Mortgage.

Sanford H. E. Freund, Shearman & Sterling & Wright, New York City, for Bondholders Protective Committee for Chattel Mortgage Bonds.

Orville W. Wood, Hugh L. M. Cole, Milbank, Tweed, Hope & Hadley, New York City, for City Bank Farmers Trust Co., as trustee under International Great Northern First Mortgage.

Leonard D. Adkins, Cravath, Swaine & Moore, New York City, and S. Mayner Wallace, St. Louis, Mo., for N.O.T.M. Bondholders Committee.

R. H. McRoberts, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for St. Louis Union Trust Co., trustee, Roland C. Behrens Committee and Little Rock-Hot Springs and Western Bonds.

Robert E. Smith, appearing by leave, for Protective Committee for Holders of the Preferred Stock of the Principal Debtor.

George C. Demas, Kadel & Wilson, New York City, for Empire Trust Co., General Mortgage Corporate Trustee.

Chas. E. Markeles, Atlanta, Georgia, for Self and Group of 60,000 shares Preferred Stock.

Martin, Peper & Martin, St. Louis, Mo., for Presley W. Edwards, individual trustee of Missouri Pac. R. Co., First & Refunding Mortgage.

Davies, Hardy, Schenck & Soons, New York City, and Fordyce, Mayne, Williams & Hartman, St. Louis, Mo., for Irving Trust Co., trustee, New Orleans, Texas & Mexico Ry. Co. First Mortgage.

Rathbone, Perry, Kelley & Drye, New York City, and Fordyce, Mayne, Williams & Hartman, St. Louis, Mo., for Central Hanover Bank & Trust Co., trustee, Central Branch, Union Pac. Mortgage.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for Guaranty Trust Co. of New York, trustee, Missouri Pac. R. Corporation in Nebraska Mortgage.

A. L. Rittenberg, Chicago, Ill., for Protective Committee, Plaza-Olive Bldg. Mortgage.

W. A. Northcutt, Louisville, Ky., for holder of Cairo & Thebes Mortgage Bonds.

MOORE, Chief Judge.

These are proceedings under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, for the reorganization of the three principal debtors, Missouri Pacific Railroad Company, New Orleans, Texas & Mexico Railway Company, and the International-Great Northern Railroad Company, and their various subsidiary debtors. The matter now before the Court is a plan of reorganization for the aforesaid companies.

Other plans for the reorganization of these companies have been before the Court on two prior occasions, the last of said plans being commonly known as the 1944 "Compromise" Plan. The present plan is a modification of that "compromise" plan.

The Plan contemplates the reorganization of these companies as a single new System company, with a provision for the separate reorganization of the I-GN if that should be necessary. The details of this plan will not be set out in full. The Plan appears in Volume LII of the Missouri Pacific Reorganization Proceedings. This Court's previous opinions on earlier plans may be found under the style of "In the Matter of Missouri Pacific Railroad Company", D.C., 39 F.Supp. 436, Id., D.C., 50 F.Supp. 936, and, Id., D.C., 64 F.Supp. 64. The modifications of the "compromise" plan which appear in the present plan are, briefly, as follows: the effective date is changed from January 1, 1943, to January 1, 1948; capitalization of the reorganized company is increased, as are annual fixed interest charges, contingent charges, preferred stock dividends, and all annual charges prior to dividends on common stock; the distribution of cash and new securities is substantially changed, the new distribution being shown in the Commission's Appendix "D", which is found at the end of this opinion; provision is made for distribution of further amounts of cash prior to consummation of the Plan if the Court should so order; provisions for issuance of warrants and for voting trusts are eliminated; and changes are made in the provisions for designation of the reorganization managers and first Board of Directors of the reorganized company.

The new capitalization and the new annual charges, as compared with the "compromise" plan are as follows:

Capitalization

| | Plan as Modified | Commission Plan of 1944 |
|---|---|---|
| Fixed-interest debt | | |
| Equipment obligations (undisturbed) | $ 21,174,664 | $ 15,755,000 |
| Collateral-trust notes [1] | 40,615,900 | 10,352,000 |
| First-mortgage bonds | 166,819,799 | 166,809,000 |
| Total | 228,610,363 | 192,916,000 |
| Contingent-interest debt | | |
| General-mortgage bonds | 169,687,482 | 159,175,000 |
| Total debt | 398,297,845 | 352,091,000 |
| Stock | | |
| Preferred stock | 100,107,904 | 57,717,000 |
| Common stock | 113,526,203 | 150,081,000 |
| | 213,634,107 | 207,798,000 |
| Total capitalization [2] | 611,931,952 | 559,889,000 |

1. In the plan herein approved the issuance of the collateral-trust notes is in the discretion of the reorganization managers. If they consider that first-mortgage 4-percent bonds, series A, will at date of consummation of the plan be salable at their principal amount, such bonds may be issued instead of the collateral-trust notes.

2. Not including such general-mortgage bonds and stock as may be issued in satisfaction of general unsecured claims of the Missouri Pacific and New Orleans.

Omitted from the statements of capitalization under both the 1944 plan and the modified plan as now approved are bonds outstanding under the Plaza-Olive Building mortgage which will be left undisturbed.* Under both plans, all income

* The above tables and notes are taken from the Commission's Report and are incorrect insofar as the Plaza-Olive bonds are concerned. New bonds are to be issued for the old Plaza-Olive bonds, and expenses of the property subject to this mortgage will, so long as any of the bonds are outstanding, be excluded from consideration in determining available net income of the reorganized company.

Annual Charges.[3]

| | Plan as Modified | Commission Plan of 1944 |
|---|---|---|
| Fixed interest | $ 8,720,921 | $ 7,271,990 |
| **Contingent charges** | | |
| Capital expenditures fund | .........[4] | .........[4] |
| First-mortgage sinking fund | 518,589 | 417,023 |
| Contingent interest | 7,635,936 | 7,355,372 |
| General-Mortgage sinking funds | 848,437 | 795,876 |
| Total contingent charges | 9,002,962 | 8,568,271 |
| Total fixed and contingent charges | 17,723,883 | 15,840,261 |
| Dividends on preferred stock | 5,005,395 | 2,885,841 |
| Total annual charges prior to common stock dividends | 22,729,278 | 18,726,102 |

The "compromise" plan was returned to the Commission because the Commission filed with the Circuit Court of Appeals a memorandum indicating that that plan had become obsolete because of substantial debt retirements and large accumulations of cash, which had resulted from war earnings. The present Plan was certified to this Court for a hearing under Section 77 for approval of that Plan by this Court. Objections and claims for equitable treatment were filed before that hearing and evidence was adduced at the hearing on those objections and claims.

The objections to the Plan have been classified by the Court into the following categories: (1) objections to valuation and capitalization; (2) objections to allocation; (3) objections to the consolidation of the debtors; and (4) miscellaneous objections.

### I. Valuation and Capitalization.
*Function of the Court.*

■ As to the function of the District Court in approving or disapproving the Commission's determination of values, the Supreme Court has said that Section 77 "leaves to the Commission * * * the determination of value without the necessity of a reexamination by the court, when that determination is reached with mate-

rial evidence to support the conclusion and in accordance with legal standards. It leaves open the question of whether in reaching the result the Commission had applied improper statutory standards". Ecker v. Western Pac. R. Corp., 318 U.S. 448, 63 S.Ct. 692, 707, 87 L.Ed. 892. Further amplifying this statement, the Court said: "While judicial review does not involve an independent examination into valuation, it does require that the court shall be satisfied, upon the record before the Commission, with such additional evidence as may be pertinent to the objections to the Commission's finding of value, that the statutory requirements have been followed."

■ As to capitalization, the Court said: "The development of the capitalization of the reorganized company which is entrusted solely to the Commission under the requirement that the plan be compatible with the public interest is that relating to the total amount of issuable securities and the quality of the securities to be issued. So long as legal standards are followed, the judgment of the Commission on such capitalization is final.

"* * * While the public interest phase of capitalization is not to be independently passed upon by the court, the court does have statutory authority to review for obedience to legal standards."

3. In each case interest on Plaza-Olive Building mortgage bonds is omitted.
4. In each case the annual payment into the capital expenditures fund will be equal to 2½ percent of gross operating revenues, less credits for depreciation charges. The amount, if any, payable into the fund in any year will depend upon the extent to which this charge and credit offset each other.

### Earnings.

A number of objections are directed to the Commission's findings of estimated normal year's earnings available for interest after Federal income taxes for the three principal debtors. A comparison of the Commission's new normal year estimates with the Trustee's forecast as adjusted by the Commission in 1940 indicates the extent to which the Commission has given effect to the increased earning capacity of the several debtors.

| | Missouri Pacific | New Orleans | Inter-National |
|---|---|---|---|
| | (000's) | (000's) | (000's) |
| Trustee's normal year forecast as adjusted in 1940.... | $18,148 | $2,267 | $1,644 |
| Commission's normal year estimate (1949).......... | 19,000 | 4,700 | 1,750 |
| Percentage of increase........................... | 4.7% | 107.3% | 6.4% |

In determining the normal year's earnings, the Commission considered the revenues, expenses and earnings of each of the three debtors for the years 1925 through 1948. It had before it Mr. Neff's testimony regarding development of the Southwestern area, particularly the development of the chemical and citrus industries and the resulting estimated increases in gross revenue, and the amounts which would remain as income available for payment of interest, as well as his testimony regarding increased volume in many other commodities. It had the testimony of an economist regarding the increase in population, and in industrial and agricultural development in the System's territory, and regarding the continued future development and the prospects of continuing prosperity. It considered the improved condition of the property resulting from expenditures in the bankruptcy period and economies in operation resulting therefrom. The Commission noted, in reaching its conclusion, that "the constantly increasing cost factor as related to increasing traffic volume has been considered as well as a belief that business activity from 1946 through 1948 which affects the classes of traffic about which Neff testified as well as the other traffic of the debtors has been at an unusually high level, which it is not reasonable to assume will be maintained uniformly in the future".

There is substantial evidence to support the Commission's conclusions and it does not appear that the Commission departed from statutory standards. It is asserted that the Commission should have based its normal year's estimates on the average of the earnings for the years 1946 through 1948. It is conceded that the Commission is not bound to base its estimates on war-years' earnings, which have been held to be too temporary and abnormal to reflect future earnings over a long period. Post-war periods of inflation are similarly too abnormal and do not necessarily reflect permanently changed conditions. The Commission increased its estimates to reflect the earnings resulting from the development of citrus and chemical industries and other changed conditions, and properly apportioned the additional revenues among the three debtors on a basis of evidence presented before it.

Objection is made to the refusal of the Commission to apportion unification savings of $280,948 and to credit the estimated normal year's earnings of each individual debtor with its share of the saving. The Commission pointed out that such savings were of significance only in determining a System capitalization, and cannot properly be included in an estimate of normal year's earnings of an individual debtor, if the estimate is based on separate operation of that debtor. The Commission found that there was no basis in the record for apportioning these savings, and pointed out that System earnings are but one factor, though an important one, in determining System capitalization. It is argued that these savings will necessarily be reflected in the allocation of securities, though in the long run the benefit of these savings will accrue to the stockholders of the reorganized company. However, since there is no basis for apportionment, and since the savings were considered in determining the Sys-

842

tem capitalization, I do not think there is any violation of the applicable legal standards.

It is also argued that the Commission improperly relied on the Trustee's original normal year's earnings estimate because that estimate is no longer relevant in the light of permanently changed conditions; but it is clear that the Commission considered the changed conditions and made a consequent increase in the estimate.

### Elements of Physical Value.

██ Objection is made to values assigned to the debtors' physical properties in determining the cost of reproduction new and less depreciation. The Commission's Bureau of Valuation supplied these values, which were determined as of December 31, 1945, and recommended that the values be increased 15% if the 1946 period prices were desired. The Commission adopted the Bureau's report with the 15% increase. It was argued in the proceedings before the Commission that the Bureau erred in determining these values, and evidence to that effect was there presented. The Commission considered and rejected this evidence. Since the Bureau's report is *"prima facie* evidence of the facts therein stated", as provided by Section 77, sub. c, (11), it cannot be said that the Commission's finding is not supported by material evidence.

██ Objection is made to the Commission's use of the 1946 physical values, and it is stated that 1948 estimates should have been used. As to this, the Commission said: "It is not reasonable to assume that the current dislocation of the economy of the United States due to the war will prevail for the indefinite future. Adoption in the future of new and improved methods of performing work and substituted use of new or equally efficient but less costly materials than those formerly used also may offset to some extent over a period of time increasing labor and material costs". The Commission is not required to assume that inflated costs "will prevail for the indefinite future", and its choice of the year 1946 as representative of costs in future years, in the exercise of its judgment, is binding on the Court. It is required to give only such effect to the present costs of reproduction new and less depreciation, as may be required in the light of all other relevant facts, under Section 77, sub e. It has determined that the present cost of reproduction is not, under the relevant facts, i.e., inflated costs, a proper element for consideration.

### Valuation of Property.

The increases in the valuations of the properties for the purpose of determination of the maximum amount of capitalization are shown in the following table:

| | 1940 and 1944 Plan (000's) | 1949 Plan (000's) | Dollar Increase (000's) | Percent Increase |
|---|---|---|---|---|
| System | $560,000 | $612,000 | $52,000 | 9% |
| Missouri Pacific | 463,000 | 509,700 | 46,700 | 10% |
| New Orleans | 67,000 | 83,700 | 16,700 | 25% |
| International | 50,000 | 57,000 | 7,000 | 14% |

The System valuation is less than the total of individual valuations because all inter-company holdings and obligations are cancelled. It is clear that the Commission was familiar with all of the relevant facts and had considered all of the factors which it is required by statute to consider in determining the value of the properties.

██ Objections are made to the System capitalization. It is argued that it should be increased to as much as $767,000,000. A number of these objections indicate a misconception of the function of the District Court in these proceedings. The Court must first look to see if the Commission considered the relevant factors and if there is material evidence to support the Commission's conclusion. Congress has, subject to limited judicial review, left this matter to the expert judgment of the Commission.

It cannot be argued that there is not material evidence to support the Commission's findings as to valuation. The Court is not concerned with methods by which the Commission might have determined a higher valuation; nor is it ordinarily concerned with the weight allegedly accorded by the Commission to any given factor. The Commission is not required to formalize its determination of value into findings upon the data which results in its conclusion. St. Louis S. W. Ry. Co. v. Henwood, 8 Cir., 157 F.2d 337.

The main argument as to valuation is that the Commission did not accord sufficient weight to the increases in the debtors' traffic, earnings, etc., in recent years. It is stated that the results of recent years should be determinative because economic conditions have been permanently changed, the changes resulting from increases in national product, national income, national debt, etc. The Commission's judgment as to the weight to be accorded these so-called "permanent" changes is final. The Supreme Court in Reconstruction Finance Corp. v. Denver & R. G. W. R. Co., 328 U.S. 495, 66 S.Ct. 1282, 1293, 1384, 90 L.Ed. 1400, after noting a "contention that the possibility of a national income much higher and interest rates much lower than before World War II" should have been considered, dismissed the objection with the statement that "those factors, we think, were before the Commission when it made its earnings estimate". Nor can it be said that the Commission is bound by the predictions of Dr. Yntema, an economist, of continuing prosperity.

Another ground of objection is that the Commission failed "to recognize the legal right and economic necessity of all Class I Railroads * * * to earn a fair return on their reproduction cost less depreciation, and thereby establish their economic value for reorganization purposes * * * ". This contention is expressly denied by Section 77 sub. e. In Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 738, 87 L.Ed. 959, the Supreme Court, in answering an argument that the Commission had not accorded proper weight to original cost, reproduction costs new, or the value for rate-making purposes, said, as to the effect to be given these values: "While it made earning power the primary criterion, it did not disregard the other valuations. It considered them and concluded in substance that they afforded no reasonable basis for believing that the probable earning power of the road was greater than what the Commission had found it to be by the use of other standards. The Commission need not do more."

The Commission followed the proper legal standards, since it is not required to determine value on the basis of reproduction costs less depreciation.

Objection is also made to the individual findings of valuation for maximum permissible capitalization of the New Orleans and I-GN. The value found for the I-GN, considered as a separate company, is $57,000,-000.

The objection to this finding is based on an allegation that discriminatory rate divisions detrimental to the I-GN have existed for twenty-five years. As to this the Commission said: "We cannot make a finding upon this record as to proper divisions which should be accorded the International. A special proceeding would be required to determine that question. As we stated in our report there are conditions other than divisions of rates which may have affected its earnings in the past and will continue in the future. Our estimate of future earnings is based on existing divisions, but as above stated, our treatment of these bondholders has been materially influenced by the other factors which we have mentioned, including the possibility that the divisions are inadequate. The petition should be denied."

Assuming the truth of the allegation, there appears to be no reason why the claim could not have been made earlier. A delay in these proceedings for the purpose of adjudication of this claim would work a hardship on the many other parties to this proceeding who have a vital interest in a present determination of this Plan on its merits. It is suggested that a specific finding as to

this matter is not required by Section 77, sub. e.

 It was held in the Chicago, Milwaukee, St. Paul & P. R. Co., case, supra, which is cited on this point, that the Commission is not required to make a precise finding as to the value of a company's properties in fixing a capitalization which results in the exclusion of common stock. It would not seem that this ruling would apply to a claim, the existence of which is in doubt. So far as is known these parties have taken no steps to have the matter heard since the Commission issued its fourth supplemental report. The Court is of the opinion that it would be inequitable to delay these proceedings to permit adjudication of this claim, and that the objection should be overruled. See Comstock v. Group of Institutional Investors, 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911.

The valuation for the purpose of maximum capitalization of the New Orleans was determined by the Commission to be $83,700,000. The Commission's own words as to the manner in which this value was arrived at are as follows: "A capitalization of * * * [estimated normal year's earnings] * * * at 4½ percent produces $104,444,444. We have hereinabove expressed the view that the greatest weight in determining a permissible capitalization should be given to past and prospective earnings. However, this is not the only factor which we should consider. *Clearly, the maximum capitalization of the New Orleans as a separate company should have a reasonble relationship to the value of its property as evidenced by the amounts of $81,541,286 and $96,836,047 above stated. No carrier would increase its investment account on the basis of a few years' favorable earnings regardless of the prospects for their continuation in the immediate future.*" [Italics mine.]

The $81,541,286 figure was an error, as the Commission noted, although approximately correct, and it represents the reproduction cost new and less depreciation as of 1946, as found by the Bureau of Valuation. The $96,836,047 figure represents the book value of the NOTM assets.

 It is argued that this is a violation of legal standards and results in unfair discrimination against the New Orleans. Clearly, the Commission accorded great signficance to the reproduction cost factor. It is argued that this is error, particularly so in view of the fact that the Missouri Pacific's estimated normal year's earnings must be capitalized at 3.7 percent to give the allowed valuation, while the New Orleans's normal year's earnings must be capitalized at 5.6 percent to give its allowed valuation.

Section 77, sub. e, reads in part: "If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the court in its report on the plan. The value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts."

The Chicago, Milwaukee, St. Paul & P. R. Co. case, supra, and many other cases are cited for the proposition that earning power is the primary criterion, and that physical values are not relevant, "except as they may indirectly bear on earning capacity". When Congress enacted Section 77 it contemplated the exclusion of creditors and stockholders from participation in the reorganized company. Section 77, sub. e. It is apparent that such exclusion would occur only where the maximum amount of capitalization which can be found to be compatible with the public interest will be sufficient to include senior creditors, but will not be sufficient to allow either junior creditors or stockholders or both to participate fully. Experience shows that this is the usual situation, though in some cases stockholders (as in the case of the NOTM Common and Missouri Pacific Preferred) are

allowed a full or limited participation,. and though in some cases debtors have effected a recovery such as to permit discharge without reorganization. This Court is of the opinion that where the fact is that a debtor's prospective earnings will, if capitalized at the usual rate, provide a value in excess of reproduction costs, either Section 77, sub. e, of the Statute does not apply, or that that fact is a "relevant fact" within the meaning of the concluding clause of Section 77, sub. e, and permits the Commission to give primary consideration to reproduction costs in determining valuation. It is not a violation of the statute to regard reproduction cost new less depreciation as a maximum permissible capitalization.

■■■■ The Commission has in other cases expressed the view that the value of physical property should be regarded as a limitation on capitalization. It has said that the requirement that the new capitalization be compatible with the public interest "requires that the capitalization shall not exceed a conservative appraisal of the assets to be taken over * * *". Western Pacific R. Co. Reorganization. 230 I.C.C. 61, 87. And it has said that "a factor of importance in determining the maximum capitalization to be permitted in * * * reorganization is the size and physical value of the plant available for the debtor's operations". Chicago, Indianapolis & Louisville Ry. Co. Reorganization, 254 I.C.C. 539, 563.

It should be emphasized that the capitalization here complained of is that of the New Orleans as a separate company. As such, there would seem to be no business purpose to be served in increasing the capitalization to an amount greatly in excess of physical value, and this is particularly so when the creditors' claims are substantially less than the physical value, leaving the equity in future earnings with the stockholders—though whether on a separate reorganization the Commission would preserve the same ratio of debt to stock is not known. It is argued that the Commission's statement that no railroad would increase its investment account on the basis of a few years' favorable earnings leads to absurd conclusions. It is stated that if the New Orleans had been "unfortunate enough to require a tunnel costing $5,000,-000.00" this would have increased the investment account and thereby increased the reorganization value. The answer is that the Commission was faced with the problem as it existed, not as it might have been. Nor does this method of valuation. lead to the result that high construction costs increase the valuation, and that low construction costs decrease it. The Commission adopted the 1946 reproduction costs, as distinguished from original construction costs, rather than those of 1948, expressing the view that 1946 costs would more accurately reflect costs for the indefinite future.

■■■ The Commission's determination of the amount of capitalization of the New Orleans is supported by material evidence, and it followed proper legal standards.

It is argued that the Plan was sent back to the Commission in order that the Commission could consider changed conditions, and the possibility of increasing the amount of capitalization; and that the Commission has not given consideration to the changed conditions. The various increases in earnings and valuations have been noted above. The Court finds that the Commission scrupulously considered the changed conditions and properly arrived at increased figures.

### New Capital Structure.

■■■ In the Western Pacific case, supra, it was held that the requirement of Section 77, sub. d, that the Plan be "compatible with the public interest" applies to the amount and character of the capitalization of the new company. In the Chicago, Milwaukee, St. Paul, & P. R. Co. case, supra [318 U.S. 523, 63 S.Ct. 740], the Court said: "The ratio of debt to stock, the amount of fixed as distinguished from contingent interest, the kind of capital structure which a particular company needs to survive the vicissitudes of the business cycle—all these have been reserved by Congress for the expert judgment and opinion of the Commission which the courts must respect."

■■■ The Commission has made all of the findings that Section 77, subs. b and d require of it in a determination of a new

capitalization and capital structure. No objection is made as to the "character" of the new capital structure, except for the contention that the warrants should have been issued to holders of the old Missouri Pacific common stock. This lies in the discretion of the Commission, which found that this would result in "unjustifiedly increasing the capitalization, since no additional cash is required". The new capital structure is approved. There is no doubt as to the power of the Commission to exclude stockholders entirely. Western Pacific case, supra.

### Summary.

■ In conclusion, though it may seem that the Court has dismissed a number of objections summarily, they have been given full consideration. Aside from the test of legal standards and the requirements that the Plan be fair and equitable, and compatible with the public interest, the Court need only be satisfied that there is material evidence to support the Commission's conclusions in regard to valuation and capitalization. The Court is satisfied as to the latter requirement, and there is no need to recite in detail the numerous factors considered by the Commission in making its findings. Reference to the Commission's report will furnish a detailed summary of the evidence before it. A number of objections to the effect that the Commission did not accord sufficient weight to certain factors were, consequently, discussed briefly or not at all.

### II. Allocation.

■ The Court must review the allocation of the new securities which has been determined by the Commission. This is a prerequisite to a finding that the Plan is fair and equitable. "Junior claims can receive nothing until the senior claims receive securities of a worth or value equal to their indebtedness". Denver & R. G. W. R. Co. case, supra [328 U.S. 495, 66 S.Ct. 1294]. In the Chicago, Milwaukee, St. Paul & P. R. Co., case, supra [318 U.S. 523, 63 S.Ct. 727, 749], the Court said: "A requirement that dollar values be placed on what each security holder surrenders and on what he receives would create an illusion of certainty where none exists and would place an impracticable burden on the whole reorganization process. * * * It is sufficient that each security holder in the order of his priority receives from that which is available for the satisfaction of his claim the equitable equivalent of the rights surrendered. That requires a comparison of the new securities allotted to him with the old securities which he exchanges to determine whether the new are the equitable equivalent of the old. But that determination cannot be made by the use of any mathematical formula. Whether in a given case senior creditors have been made whole or received 'full compensatory treatment' rests in the informed judgment of the Commission and the District Court on consideration of all relevant facts."

■ The Court in that case also stated the rule to be applied to groups of bondholders with different mortgages: "But where, as here, each group of bondholders is contributing to a new system mortgage separate properties from old divisional mortgages, it is necessary to fit each into the hierarchy of the new capital structure in such a way that each will retain in relation to the other the same position it formerly had in respect of assets and of earnings at various levels. If that is done, each has obtained new securities which are the equitable equivalent of its previous rights and the full priority rule of the Boyd case [Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931], as applied to the rights of creditors *inter se,* is satisfied."

By analogy, the same rule applies where different groups of bondholders hold mortgages on properties of separate companies, and the separate companies are reorganized as a single new company. As this Court said In re: Missouri Pac. R. Co., D.C., 39 F.Supp. 436, 447, in regard to an objection of the I-GN first mortgage holders to the allocation to them of second mortgage bonds of the reorganized company: "Since the plan is primarily based on a consolidation of the three principal units involved in these proceedings, there seems to be no more basis for the contention of

this interest that it must be given a first mortgage position than there would be in the case where one company has two mortgages, each secured by a separate and distinct part of its railroad line."

 So long as full compensatory treatment is given, "stratification of securities issued to creditors need not follow invariably the relative priority of the claimants". Western Pacific case, supra. Where bondholders "receive only a face amount of inferior securities equal to the face amount of their claims", and where junior claimants also participate, "the rule of the Boyd case 'protects the rights of senior creditors against dilution either by junior creditors or by equity interests.' * * * Where junior interests participate in a plan and where the senior creditors are allotted only a face amount of * * * their claims, they 'must receive, in addition, compensation for the senior rights which they are to surrender.'" Chicago, Milwaukee, St. Paul & P. R. Co. case [318 U.S. 523, 63 S.Ct. 727, 751], supra.

 A creditor holding collateral is entitled to receive new securities having a market value equal to the amount of his claim if the collateral has a market value equal to his claim. In re New York, N. H & H. R. Co., D.C., 54 F.Supp. 595, modified 2 Cir., 147 F.2d 40, certiorari denied Commonwealth of Massachusetts v. New York, N. H. & H. R. Co., 325 U.S. 884, 65 S.Ct. 1577, 89 L.Ed. 1999. Where a creditor is allocated more than the face value of his claim in new system securities, in order to give him full compensatory treatment, the result is not unfair discrimination as regards a junior claimant. In re Chicago, R. I. & P. Ry. Co., D.C., 50 F.Supp. 835.

The Commission's Appendix showing the details of the distribution of cash and new securities is found at the end of this opinion. The mortgage securing the first and refunding bonds is a first lien on substantially all Missouri Pacific's lines and other property, with certain exceptions noted by the Commission. No objection to the Plan is made by the Group of Institutional Investors for or by the Trustee of these bonds, except that the latter takes the position that

these bonds have not been given full compensation, and that this claim will be pressed if the objection of any junior claimant is upheld.

Holders of the Cairo & Thebes first mortgage bonds, the Trustee of the Little Rock & Hot Springs Western first mortgage bonds, holders of the Boonville, St. Louis & Southern first mortgage bonds, and holders of the publicly held Central Branch Union Pacific first mortgage bonds, have made no objection.

No objection is made by the Trustee of the Protective Committee for the I-GN first mortgage bonds. Nor is any objection made by the Trustee of or the Bondholders Group for the NOTM first mortgage bonds. The Trustee of the Missouri Pacific 5½% Convertible Gold Bonds approves the Plan, while the Convertible Bondholders Group has made the claim that it is entitled to cash payment. This claim is based upon a factual misconception and will not be discussed herein. A number of parties, however, raise objections requiring discussion.

*Discrimination against the NOTM.*

Holders of both the publicly held NOTM common stock and of the Missouri Pacific Secured Serial Bonds allege that the Commission has discriminated against the NOTM. The gist of the argument is that it is unfair to consolidate a road of high prospective earning power in relation to its allowed capitalization with roads of comparatively low earning power in relation to their allowed capitalization, in view of the fact that new System securities are allocated in satisfaction of creditors and stockholders of all three roads. They state that while the NOTM contributes 18.4 percent of the System earnings, it is allowed only 12.9 percent of the System capitalization, and that their participation in the new company is consequently inadequate. As to this the Commission said:

"This argument, while seemingly plausible, fails to recognize, as we have in determining the respective capitalizations, the difference in the quality of the new securities constituting the proportionate shares of the new system capitalization allotted to the two debtors. Merely to compare the dollar

amounts of the maximum capitalizations of the two debtors without regard to the quality of the new securities to be issued thereunder in satisfaction of creditors' claims is of small significance.

"To illustrate, about 60 percent of the Missouri Pacific's share of the system capitalization will be represented by funded debt securities and about 40 percent by stock while the entire New Orleans' share of the system capitalization will be represented by funded debt securities except for about $3,025,000 of new Class-A common stock, all to be allotted with respect to its stock. If the mathematical ratio of each debtor's earnings to total system capitalization were solely determinative of the share of the total amount of securities to be issued in the reorganization, each debtor's share of the system capitalization should be represented by the same proportionate share of each class of the securities."

The validity of the objection rests on the propriety of the comparison of face values of the NOTM securities and of the value of the NOTM common stock as found by the Commission with the face values of the new securities allocated to the old securities and common stock and the use of the result of the comparison as a test of fairness. Such a comparison is not proper. The Commission recognized that the NOTM properties would contribute more in earnings in relation to its allowed capitalization than would the Missouri Pacific or I–GN properties. In effect, it recognized the fact that capitalizations of the three debtors as separate companies is not *per se* a proper basis for the allocation of new System securities to creditors of the individual companies. The Group of Institutional Investors has prepared an exhibit showing the market value of the new securities issued in respect to Missouri Pacific obligations and NOTM obligations in relation to the market value of the new System securities. In terms of market value, the NOTM is given 18.63 percent of the new System securities. The objectors argue that on the basis of the contribution of NOTM's normal year's earnings of $4,700,000 to the System normal year's earnings of $25,450,000, the NOTM should be accorded 18.4

percent of the $612,000,000 System valuation. If the NOTM's capitalization were $104,444,444 (normal year's earnings capitalized at 4½%), this figure would be approximately 17 percent of the new System capitalization. The market value percentages meet the objectors' demands.

The Group of Institutional Investors has also prepared an exhibit showing that for every dollar of New Orleans normal year earnings available for interest the Plan allocates $13.06 of fixed interest obligations to New Orleans security holders, whereas for every dollar of Missouri Pacific normal year earnings available for interest the Plan allocates $9.46 of fixed interest obligations to Missouri Pacific security holders; and that the allocations of fixed and contingent interest obligations per dollar of normal year earnings available for interest are $17.80 in the case of the New Orleans and $15.65 in the case of the Missouri Pacific. Since the NOTM obligations are given high quality securities in the New System, and since that high quality has been conclusively shown, the Court cannot find any merit in the allegation of discrimination.

### NOTM Common Stock

Holders of the publicly held NOTM common stock object to the new securities allocated to them. The Commission found that the capitalization of the NOTM as a separate company would permit a valuation of $150 per share of NOTM common stock. As stated above, the Commission, in view of the fact that the prospective earnings of the NOTM as compared to its separate capitalization were higher than the earnings of the Missouri Pacific and I–GN as compared to their separate capitalizations, allocated $175 (face value) of the new System securities to each share of NOTM Common. Each share of publicly held NOTM common was given $75 each in new General Mortgage Series A and Series B bonds, and $25 in new Class A Common Stock. The Commission was faced with the problem of what status in the new System should be accorded stockholders of a separate company which is one of three companies being reorganized as a single new company. The

problem is analogous to a situation where there are divisional mortgages of a single company, and a method of treatment of these mortgages must be divised in the allocation of securities of the reorganized company. Of such a situation, the Supreme Court said in the Chicago, Milwaukee, St. Paul, & P. R. Co. case, supra [318 U.S. 523, 63 S.Ct. 747]: "The contribution which each division makes to a system is not a mere matter of arithmetical computation. It involves an appraisal of many factors and the exercise of an informed judgment. Furthermore, an attempt to put precise dollar values on separate divisions of one operating unit would be quite illusory. As the Commission recently stated, 'The properties comprise one operating unit; a complete separation of values would necessarily have to be based on extensive assumptions of unprovable validity; and any attempt at such a separation would in the end serve no purpose except to present an apparent certainty in the formulation of the plan which does not exist in fact.' "

Here, the Commission had to determine the equity which the NOTM stockholders contribute to the new company. The figures in regard to the earnings, physical values, traffic contributed, and all other factors were before the Commission. It should also be noted that the inter-company debt is cancelled. The allocation of General Mortgage Bonds sufficiently reflects the status of the NOTM common stockholders as contributors of a proportionately large earning power. The Court does not believe that any attempt to determine the market value of the stock and of the new System securities allotted is necessary. Chicago, Milwaukee, St. Paul, & P. R. Co. case, supra. But such a comparison (using Mar. 9, 1950, quotations for the new securities) is very favorable, as compared with the 1948 market value of the old common stock. It is also argued that the treatment accorded these bonds is excessive. In view of the NOTM's contribution of earning power, the Court finds that it is in all respects fair and equitable.

*Missouri Pacific Secured Serial Bonds.*

The publicly held Missouri Pacific Secured Serial Bonds (of a principal amount of $11,245,000, on which interest had accumulated in the amount of $8,904,634 on January 1, 1948) are secured by 121,400 shares of NOTM common stock. These figures do not include the amount of bonds purchased by the Trustee of the Missouri Pacific pursuant to order No. 3464 in the face amount of $820,000. The Trustee under the indenture securing these bonds, two bondholders' committees and one individual holder, have objected to the new securities allocated to them.

The objections made by these parties to the capitalization of the NOTM have been discussed above. Their objection to allocation is founded on the legal principle, set out above, that a secured creditor is entitled to receive the market value of his collateral to the extent of his claim, and is entitled to share as a general creditor as to the balance of his claim if the market value of his collateral is less than the amount of his claim. It is asserted that the market value of the NOTM common stock was $215 per share on December 31, 1949. This is the value which Mr. Wyer said was the "book" value of that stock on that date and is clearly not market value. It is also stated that the Commission's determination of the value of $150 per share is the market value. The Commission said that that value "is not based by us on an assumed present market value of the stock but on the value which in the System reorganization, we consider should be used in allocation of new securities". It increased this finding, allotting $175 face value of new System securities to each share of publicly held NOTM stock, in recognition of the contribution of NOTM properties; but neither value can be considered market value. At the hearing it was shown that the market quotations for NOTM common were 90 bid and 100 ask on March 9, 1950. The price range in the years 1947 and 1948 was 87 to 110. Taking 100 as the market value, the value of the security is $1,000 per bond. The value of the General Mortgage A and B bonds allocated to each Secured Serial bond was on March 10, 1950, $982, and it is likely that these bonds will sell at a higher price when the reorganization is completed. New preferred and common stock was also allocated to

850

these bonds. The Commission did not find the market value of the NOTM common or of the new securities issued therefor. Nor is it required to "create an illusion of certainty where none exists". Chicago, Milwaukee, St. Paul, & P. R. Co. case, supra [318 U.S. 523, 63 S.Ct. 749]. It is also argued that the Commission did not consider that the pledged stock represents the control of the NOTM and that this factor was not considered by the Commission in the allocation of new securities to the Secured Serials in compensation for the loss of their security. This fact was before the Commission and is recited in its report. Moreover, the evidence shows that the Missouri Pacific and the New Orleans are interdependant. Therefore, a public sale of the NOTM common would result in a diminution of the value of the NOTM, which would be reflected in the price of its stock. The Commission's allocation has given the Secured Serials full compensatory treatment. Other demands of some of these objectors for payment in cash, for public sale of the collateral, and for distribution to them of the collateral are without merit.

### Missouri Pacific General Mortgage 4s.

The Bondholders Protective Committee for the Missouri Pacific General Mortgage bonds is on record as approving the Plan insofar as allocation of new securities is concerned. The Trustee of these bonds objects to the allocation, however, and since one group cannot waive the rights of the rest of the class, the objection must be considered.

The General Mortgage 4s were given new preferred stock in a face value equivalent to the amount of their claim. The dividend of the stock is $5, and is not cumulative. Apparently, the claim here is simply that they would have liked to have done better. Their relative position was maintained in the new capital structure. No violation of priority is alleged. The Court finds that the treatment accorded these bonds is fully compensatory and fair and equitable.

### I–GN Adjustment 6s.

Three individual holders of I–GN Adjustment Mortgage 6% bonds object. The principal amount of the publicly held portion of these bonds is $13,807,000, and the unpaid interest as of January 1, 1948, amounted to $14,498,085. The remainder of these bonds, amounting to about $6,500,000 principal and interest, are inter-company holdings and are cancelled in the System reorganization. To the publicly held bonds the Commission allocated preferred and Class A common stock in a face amount of $15,188,470. The objection of these parties to the separate I–GN capitalization has been discussed above. Since that capitalization is correct, the limited participation permitted these bonds is a matter of mathematical computation, and there has been no violation of the rule of absolute priority in permitting the Missouri Pacific preferred stockholders to participate. The treatment accorded these bonds is fair and equitable.

### Exclusion of Missouri Pacific Common Stock, I–GN General Creditors and I–GN Common Stock.

The Missouri Pacific preferred stock was given partial recognition. These stockholders did not file an objection to allocation, but directed their objections to capitalization. Their contention that the Commission should have increased the allowed capitalization has been denied.

The Missouri Pacific Common stock was excluded, the Commission finding that the equity of the common stock had no value. The objections of the common stockholders as to capitalization have been considered above, as has their demand for the issuance of warrants. It is contended that assuming the Commission's capitalization to be correct, the common stock is entitled to participate with the preferred stock in some degree in the equity remaining after allocation of new securities to all Missouri Pacific creditors. The par amount of the preferred stock is $70,190,000, with $92,981,130 accumulated unpaid dividends as of January 1, 1948. After satisfaction of creditors, only about $30,000,000 par value Class B common stock of the new System securities remained. It is argued that it is improper to require satisfaction of the accumulated dividends on the preferred stock, before permitting common

stockholders to share in the remaining equity. As the Commission said, under the circumstances there could be no other method of satisfaction of the preferred stock claim. The relative priorities could not otherwise be maintained except by a requirement that the first $92,000,000 in dividends declared on this $30,000,000 Class B stock be paid to the old preferred holders. Assuming an annual $5 dividend, payment of $92,000,000 would take about sixty years. It is impossible to find that the common stock has any equity. The Commission's finding of "no value" is based on material evidence and is affirmed.

Similarly, the Commission's finding that the unsecured creditors and stockholders of the I–GN have no interest is based on material evidence and is affirmed.

### III. Consolidation.

#### Statutory Authority.

The contention is made that the Interstate Commerce Commission does not have the power to require a merger or consolidation of the three principal debtors under Section 77 of the Bankruptcy Act, without observing the requirements and procedures of Section 5 of the Interstate Commerce Act, 49 U.S.C.A. § 5. This question has been decided by other courts. In Re Chicago, R. I. & P. Ry. Co., 7 Cir., 168 F.2d 587, 594, the Court in considering whether the Interstate Commerce Commission was required to follow the provisions of the Interstate Commerce Act in making a plan of reorganization, which called for a consolidation, said, as follows: "The state suggests that the only terms and conditions upon which the reorganization could be approved by the Commission are fixed by Section 5 of the Interstate Commerce Act. Unfortunately, however, for this contention, this is a reorganization proceedings and the controlling terms and conditions are fixed by Section 77 of the Bankruptcy Act. That Act authorizes the Commission to act subject only to the condition that the plan shall be compatible with the public interest and not inconsistent with the purposes of the Interstate Commerce Act. On the other hand, Section 5(2) and (11), * * * relates to consolidation

and merger wholly outside of the Bankruptcy Act, in the course of ordinary procedure, and the Commission has power to act if it finds the proposed transactions are within the scope of Section 5(2) and (11) and will be consistent with the public interest. However, we think the requisite findings under the two acts are equivalent. 'Consistent with the public interest' is the same as 'compatible with the public interest.' Apparently the Commission complied with both statutes."

This holding has been affirmed by the Supreme Court in the case of Callaway v. Benton. 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553. The Supreme Court there said that Section 5 of the Interstate Commerce Act "relates to voluntary mergers, not to the purchase of a leased line as part of a plan of reorganization. The Commission can undoubtedly carry on § 5 proceedings * * * but that procedure was not followed in this case. The Commission preferred, instead to carry out the consolidation under the authority of § 77, sub. (b) (5) of the Bankruptcy Act, which provides that the plan of reorganization may include 'the merger or consolidation of the debtor with another corporation or corporations'. That power flows from a different source than the power over consolidations under the Interstate Commerce Act".

The objectors also rely on In re Florida East Coast Railway Co., D.C., 81 F.Supp. 926, 932. In that case the District Court rejected a Commission plan which provided for the merger of a railroad in reorganization with one not in reorganization. The merger was objected to by an overwhelming majority, whereas in this case the Commission has noted that "the predominate attitude of the parties interested in the New Orleans appears to be that the New Orleans should be included in the system". Also, the roads to be consolidated are already affiliated. The District Judge recognized these factors as valid grounds for distinction when he said that Congress did not intend to permit a merger "undesired by the majority in amount of the affected parties", and that: "This case is not as though the merging corporations were affiliates, and members of the same corporate family already. In

such a case there is really a mere simplification of corporate organization of interests already related. The Coast Line, though an unsecured creditor, is really a stranger in interest, having been found to have no interest in the railroad property to be reorganized."

Moreover, the Court of Appeals, in affirming the District Court, sub nom Atlantic Coast Line R. Co. v. St. Joe Paper Co., 5 Cir., 179 F.2d. 538, 544, stated as follows (Judge Hutcheson writing for the majority): "We are in no doubt, however, that a plan providing for what the trial judge broadly called a 'forced merger', that is, a merger over the objection of the debtor and all its creditors, might be lawfully certified to the court and lawfully approved and confirmed by it."

█ It is the Court's conclusion that the Commission has the statutory power to require a merger or consolidation of affiliated railroads under Section 77 of the Bankruptcy Act when all of the railroads consolidated are before the Commission as debtors seeking reorganization, and that in such a case the Commission is not required to follow the provisions of the Interstate Commerce Act.

### Objections of the State of Texas.

The Plan calls for a transfer to the single reorganized company of the assets and properties of the three principal debtors and of all of the subsidiaries of these debtors, with the exception of the Missouri-Illinois Railway Company. Alternate provision for the separate incorporation of the I-GN in the State of Texas is made, in view of a contract made by that company with Anderson County, Texas. That contract being within the prohibition of Section 77, sub. n, the contemplated separate incorporation must be effected, as this Court found in a previous opinion.

A number of the subsidiary companies involved are corporations created under the laws of the State of Texas, which State objects to the consolidation of these subsidiaries on the ground that its statutes prohibit operation of a railroad in that State except by a corporation chartered under the laws of that State. The Court has

considered this objection in a previous opinion, at which time it was overruled, and the Court is of the opinion that it should again be overruled.

█ The State of Texas also objects on the ground that the subsidiary companies in question are engaged only in intrastate commerce, not in interstate commerce, and that, therefore, the Commission has no power to establish the proposed consolidation. Assuming the correctness of the assumption that these subsidiaries are engaged in intrastate commerce only, the point is of no significance. These subsidiaries are properly before the Court and the Commission in Section 77 proceedings as subsidiaries of another debtor. Section 77, sub. a. In this case the authority of the Commission to carry out the consolidation does not have its source in the commerce clause of the Constitution; it stems from the bankruptcy power, although the requirement of "compatibility with the public interest" is in each case identical. In re Chicago, R. I. & P. Ry. Co., supra, and Callaway v. Benton, supra.

### The Public Interest.

█ Objection is made to the Commission's finding that the consolidation will be in the public interest. This question has also been considered by this Court in earlier opinions. The Commission had before it evidence as to System economies. In its opinion, the resulting simplification of the new capital structure would be in the public interest. It is also pointed out that the existence of separate companies led to the controversies over the NOTM-Missouri Pacific intercompany debt. There is no doubt but that the Commission's finding is supported by material evidence.

### IV. Miscellaneous Objections.
### Effective Date.

The Commission designated January 1, 1948, as the effective date of the Plan. It is urged that the Commission should have chosen January 1, 1943. The result, of course, would be to reduce the accrued interest on creditors' claims, to the benefit of the junior interests. The effective date should be as near as possible to the date of

the expected consummation of the Plan. The Commission's effective date, in the opinion of the Court, meets this requirement.

 One holder of NOTM capital stock states that the Plan is unfair in that it determines the value of that stock as of the effective date of the Plan, but makes no provision for subsequent increases in the value of the stock resulting from earnings during the period between the effective date and the date of consummation. There is no merit to the objection. The lapse of time between the effective date and the date of consummation is inevitable. The rights of the parties must be fixed as of some given date. The power to fix an effective date, though not expressly set out in the statute, is now well established. Western Pacific case, supra. The Commission's selection of January 1, 1948, was necessary as a practical matter and was selected with due regard to the interests of the many parties to these proceedings.

### Evidence at the Hearing.

 Certain evidence was excluded at the hearing on the Plan. A railroad expert was asked to compare the result of the Plan with the National Transportation Policy as expressed in repealed laws dealing with the recapture of earnings. The Court does not believe that a witness can present evidence as to what the law is or was, or that a witness can properly state his conclusion that the Commission's action amounts to "confiscation". And the proposed evidence is not relevant to the issues here presented.

 Other evidence as to what the Commission did and what the Commission ought to have done, was excluded. These are matters for the Court to determine on a reading of the record and consideration of the briefs, arguments and applicable law. A great deal of data which was before the Commission was again offered to this Court. This should have been included in the brief, with references to the record. The Statute does not contemplate that all of the evidence placed before the Commission be again placed before the Court. A railroad expert was asked to state whether, in his opinion, the treatment of certain parties was fair. This, too, should have been included in the brief. The Court, in determining that a plan of reorganization is fair and equitable, must reach a conclusion in the exercise of its own independent judgment.

### Other Objections.

The Secured Serial bonds are secured by 121,460 shares of NOTM common stock. Some of these bonds were paid off shortly before bankruptcy, and 60 shares of the collateral, representing the paid-off bonds, were never returned to the Trustee of the Missouri Pacific. The Court finds that the now outstanding Secured Serial bonds should not, as a matter of equity, be entitled to regard these 60 shares as collateral for their bonds.

An objection is made to the effect that the NOTM is not properly in bankruptcy, as no publicly held debt is in default. The inter-company debt now in default is an asset to which creditors and stockholders (to the extent that the latter have any interest) are equitably entitled. The validity of the debt has been upheld. No reason exists for the preference of creditors and stockholders of the NOTM over those of the Missouri Pacific.

It is also asserted that the Plan does not make a proper or advantageous use of the available cash. The Court finds that the Plan is proper in this respect.

Seven parties object to the representation allowed them in the selection of the Board of Directors and the Reorganization Managers. It is also asserted that the selection is given to a small group with close, interlocking interests, and that the terms of office are too long. The Commission gave extensive consideration to this problem, and the provisions of the Plan in this respect are fair and equitable.

### Conclusion.

The Court has before it the income accounts and balance sheets for 1949 of all of the debtors involved. The year 1949 was generally considered by the parties at the hearing not to reflect the actual potentiali-

ties of the Missouri Pacific because of the strike and of the Gulf Coast Lines because of the freeze. The Court has also had available information as to the operations of these roads for the first six months of 1950. The revenues and earnings in these periods do not indicate that the Plan is outmoded or pessimistic.

Nor does it seem that the Korean situation has at this time caused any substantial change on the facts on which the Court has relied. The table below compares the market values of the new securities on March 8, 1950 (the date of the market values used in consideration of allocation questions) with the values on July 25, 1950.

Market Quotations

| New Securities | March 8, 1950 | | July 25, 1950 | |
|---|---|---|---|---|
| | Bid | Ask | Bid | Ask |
| Equipments | Taken at 100 | | | |
| 1st Mortgage A's 4% | " | (A) | | |
| 1st Mortgage B's 4% | 89½ | 91½ | 88 | 89½ |
| 1st Mortgage C's 4% | 87¼ | 89¼ | 86 | 87½ |
| General Mortgage A's 4½% | 67½ | 69½ | 68 | 69 |
| General Mortgage B's 4½% | 63½ | 65½ | 64 | 66 |
| Preferred | 53¼ | 55¼ | 53½ | 54½ |
| Common, Class A | 22¾ | 24¾ | 25 | 26 |
| Common, Class B | 17.10 | (B) | 24.15 | (B) |

(A) The new First Mortgage Bonds, Series A (or Collateral Trust Notes) are taken at 100 because the Plan contemplates that they will be salable at par.

(B) The Class B Common Stock of the new Company is allocated to the old preferred stock of the Missouri Pacific in the ratio of 3 new shares for each 7 old shares. The market quotations for the old preferred stock on March 8, 1950, was $6⅜ per share or $44,625 for 7 shares. Since no quotations are available for the new Class B Common Stock, the price per share used has been computed by dividing by 3 the cost of 7 shares of old preferred stock and then increasing this price by 15 percent to reflect approximately the premium at which the new securities to be issued under the Plan are selling on the "when issued" market.

On consideration of the record and the evidence the Court is of the opinion that all objections should be overruled and that all claims for equitable treatment should be denied. Due regard has been given to the requirement that the Commission approve a plan which will be compatible with the public interest. The purpose of these proceedings is to effect a restora-

tion of the debtors' credit. The Court is satisfied that the Plan complies with the provisions of sub-section b, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and that the Plan conforms to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders.

Section T of the Plan provides that the expenses of reorganization shall be paid in cash as a cost of administration prior in lien to the new securities issued under the Plan. Hearings have been held before the Commission on the expenses and fees incident to the reorganization. The Court finds that the Plan conforms to the requirements of Section 77, sub. e(2) and (3).

The Commission's findings of "no value" for the interests of the holders of the common stock of the Missouri Pacific and the unsecured creditors and stockholders of the I-GN have been affirmed above.

The Plan will be approved and order overruling all objections, denying all claims for equitable treatment, and approving the Plan may be submitted.

# APPENDIX D.

## Missouri Pacific Railroad Company Reorganization
### Interstate Commerce Commission Modified Plan
### Distribution of Cash and New Reorganization Securities

| | Principal | Interest to January 1, 1948 | Total Claim | Cash | Undisturbed | First Mortgage 4-Percent Bonds — Series A—20-Yr. (or Collat. Trust Notes) | Series B—35-Yr. | Series C—50-Yr. | General Mortgage Income 4½-Percent Bonds — Series A—65-Yr. | Series B—75-Yr. | Preferred Stock $5 Dividend —$100 Par Value | No-Par Common Stock (at $100 Per Share) Class A | Class B |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Missouri Pacific R. Co.** | | | | | | | | | | | | | |
| Equipment obligations (as of 1-1-48) | $ 16,556,567 | ............ | $ 16,556,567 | ............ | $16,556,567 | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| First and refunding mortgage 5-percent bonds: | | | | | | | | | | | | | |
| Series A, due February 1, 1965 | 17,840,500 | $ 7,061,865.77 | 24,902,365.77 | $ 2,823,259.13 | ........ | $ 6,440,420.50 | $ 6,440,420.50 | $ 6,440,420.50 | 5,198,265.64 | ........ | ........ | ........ | ........ |
| Series F, due March 1, 1977 | 94,180,000 | 36,887,169.80 | 131,067,169.80 | 14,746,704.40 | ........ | ........ | 33,904,800 | 33,904,800 | 48,510,865.40 | ........ | ........ | ........ | ........ |
| Series G, due November 1, 1978 | 25,000,000 | 10,206,332.50 | 35,206,332.50 | 4,081,000 | ........ | ........ | 9,075,000 | 9,075,000 | 12,977,332.50 | ........ | ........ | ........ | ........ |
| Series H, due April 1, 1980 | 25,000,000 | 10,312,500 | 26,312,500 | 4,122,750 | ........ | ........ | 9,112,500 | 9,112,500 | 12,964,750 | ........ | ........ | ........ | ........ |
| Series I, due February 1, 1981 | 61,170,000 | 24,213,122.96 | 85,383,122.96 | 9,680,152.50 | ........ | ........ | 22,082,370 | 22,082,370 | 31,538,230.46 | ........ | ........ | ........ | ........ |
| General mortgage, 4-percent bonds, due March 1, 1975 | 49,239,421 | 29,274,723 | 78,614,144 | ...... ...... | ........ | ........ | ........ | ........ | ........ | ........ | $ 78,614,144 | ........ | ........ |
| Secured serial 5¼-percent bonds, due Dec. 1, 1956-56 | 11,245,000 | 8,904,634 | 20,149,634 | ...... ...... | ........ | ........ | ........ | ........ | 8,433,750 | $ 8,433,750 | ........ | 1,282,078 | 2,811,250 |
| Convertible 5¼-percent bonds, due May 1, 1949 | 45,493,000 | 37,948,744 | 83,441,744 | ............ | ........ | ........ | ........ | ........ | ............ | ............ | 8,098,600 | 74,343,144 | ........ |
| Plaza-Olive Bldg. bonds, due October 1, 1937-40 | 498,000 | ...... ... | 498,000 | (Would receive bonds under new Plaza-Olive Bldg. mortgage, which has been created) | | | | | | | | | |
| Cairo & Thebes first mortgage 4-percent bonds, 1951 | 1,699,000 | 226,533 | 1,925,533 | 169,900 | ........ | ........ | 611,640 | 611,640 | 532,353 | ........ | ........ | ........ | ........ |
| Little Rock & H. S. W. first mtge. 4-percent bonds, 1939 | 1,140,000 | 592,800 | 1,732,800 | ...... .... | ........ | ........ | 171,000 | 171,000 | 1,390,800 | ........ | ........ | ........ | ........ |
| Boonville, St. L. & So. first mtge. 5-percent bonds, 1951 | 23,000 | 14,854 | 37,854 | 1,150 | ........ | ........ | 9,200 | 9,200 | 18,304 | ........ | ........ | ........ | ........ |
| Central Branch, U. P., first mtge. 4-percent bonds, 1948 | 634,000 | 204,993 | 838,993 | 38,674 | ........ | ........ | 200,344 | 200,344 | 399,631 | ........ | ........ | ........ | ........ |
| Claims of general unsecured creditors | (Amount not finally ascertained—will receive for total claims, including interest to January 1, 1948, approximately 10 percent in new preferred stock and remainder in common class A stock (at $100 per share)) | | | | | | | | | | | | |
| Preferred stock | 70,190,100 | ........ ... | 70,190,100 | ........ ...... | ........ | (Will not participate in the reorganization) | | | | | | ........ ........ | $ 30,481,471 |
| Common stock | 81,314,343 | ........ ... | 81,314,343 | ............ | ........ | | | | | | | | ........ |
| **New Orleans, Texas & Mexico Ry. Co.** | | | | | | | | | | | | | |
| Equipment obligations | 2,720,960 | ... .... | 2,720,960 | ............ | 2,720,960 | ... ... | ........ .... | ........ .... | ............ | ...... .... | ........ | ........ | ........ |
| First mortgage bonds due 1954-56 | 40,615,900 | 602,620 | 41,218,520 | 602,620 | $40,615,900 | ........ | ........ .... | ........ .... | ............ | ............ | ........ | ........ | ........ |
| Claims of general unsecured creditors | (Amount not finally ascertained—will receive for total claims, including interest to January 1, 1948, an equal principal amount of new general bonds, series A) | | | | | | | | | | | | |
| Capital stock (held by public) | 859,800 | ............ | 859,800 | ............ | ........ | .. ... .... | .. ... .... | ............ | $44,250 | $44,250 | ............ | $14,250 | ........ |
| **International-Great Northern R. Co.** | | | | | | | | | | | | | |
| Equipment obligations | 1,861,137 | ............ | 1,861,137 | ............ | 1,861,137 | ........ | ........ | ... .... | ............ | ............ | ............ | ........ | ........ |
| First mortgage bonds: | | | | | | | | | | | | | |
| Series A, 6-percent, due July 1, 1952 | 17,250,000 | 8,797,500 | 26,047,500 | 3,105,000 | ........ | ........ | 1,112,625 | 1,112,625 | 10,350,000 | 10,367,250 | ........ | ........ | ........ |
| Series B, 5-percent, due July 1, 1956 | 6,000,000 | 2,550,000 | 8,550,000 | 900,000 | ........ | ........ | 360,000 | 360,000 | 3,462,000 | 3,468,000 | ........ | ........ | ........ |
| Series C, 5-percent, due July 1, 1956 | 6,500,000 | 2,337,500 | 7,837,500 | 825,400 | ........ | ........ | 330,000 | 330,000 | 3,173,500 | 3,173,000 | ........ | ........ | ........ |
| Adjustment mortgage 6-percent bonds, 1952 | 13,807,700 | 14,498,085 | 28,305,785 | ............ | ........ | ........ | ........ | ........ | ............ | ...... .... | 9,113,983 | 6,075,388 | ........ |
| Claims of general unsecured creditors | (Amount not finally ascertained—will not participate in the reorganization) | | | | | | | | | | | | |
| **Total** | $585,974,428 | $194,638,971.03 | $784,610,405.03 | $41,096,210.03 | $21,174,664 | $40,615,900 | $3,409,899.50 | $3,409,899.50 | $149,534,422 | $24,092,850 | $100,147,904 | $85,444,732 | $30,081,471 |
| **Cumulative Total** | | | | | $41,790,564 | $145,200,463.50 | | $225,618,363 | $72,204,395 | $35,297,245 | | $98,405,749 | $581,850,481 | $611,931,952 |

System preferred claims of general creditors will be paid in cash at their principal amount plus interest.

On Petition for an Order Directing the Trustee of Missouri Pacific Railroad Company to take Steps Leading to the Termination of the Proceedings as to Gulf Coast Lines.

Petitioners are the Protective Committee for the Holders of Missouri Pacific Railroad Company 5¼% Secured Serial Gold Bonds; John Speed Elliott, a holder of the same bonds; and John Speed Elliott, DeLancey C. Smith, and others, holders of a minority of the common stock of the New Orleans, Texas & Mexico Railway Company. The Missouri Pacific has been in reorganization proceedings in this court in proceedings under Section 77 of the Bankruptcy Act for some time, as have the railroad companies comprising what is known as the Gulf Coast Lines, which consist of the NOTM and its subsidiaries, except the I-G-N. The NOTM is a subsidiary of the Missouri Pacific. From 1937 to date, Guy A. Thompson has been Trustee of these companies.

This petition, which was filed July 22nd, 1949, alleges that the reorganization proceedings have been unduly prolonged as to the Gulf Coast Lines, and that the Gulf Coast Lines are solvent, excluding intercompany debt and "subject to a claim asserted by the Missouri Pacific against New Orleans", and are no longer in need of reorganization. It is further alleged that the Trustee has failed to refund or extend the claim of the Missouri Pacific against the New Orleans, and has failed to reduce the interest thereon to a fair and reasonable rate, with the result that the latter company has been kept in these bankruptcy proceedings improperly, and has been burdened with the accrual of interest at an excessive rate, to its detriment and to the benefit of its parent company, Missouri Pacific.

A request to intervene specially for the purpose of presenting a substantially identical petition was denied by this Court in February, 1949, on the ground that such action would encroach upon the province of the Interstate Commerce Commission in preparation of the Plan of Reorganization then before it. An appeal was taken from an order denying the petition to intervene, and that appeal is now pending. The petition was then taken to the Interstate Commerce Commission. The Commission in its Reports on the Plan denied the request for reduction of interest, and stated that only the Court could determine whether the NOTM should be discharged.

The question of reduction of interest is the subject of Objection 5 of John Speed Elliott and the aforesaid Protective Committee. Since the matter was decided by the Commission in its proposed Plan, it should ordinarily be decided by the Court at the hearing for approval or disapproval of the Plan as provided for in Section 77. However, the question of reduction of interest necessarily puts in issue the amount of the NOTM debt, and since that amount has a relation to the ability of the Gulf Coast Lines to refund without Section 77 reorganization, the latter being the main issue raised by the petition, the question will for convenience be discussed herein.

Briefly, the facts are that the Missouri Pacific prior to 1933, borrowed money at 6 percent and at approximately the same times made advances to the NOTM at the same rates. In 1933 both companies went bankrupt. In 1946 the Missouri Pacific effected a compromise of the amounts it had borrowed at 6 percent, the interest on the principal amounts being reduced to 4 percent retroactively to 1933. It is alleged that the purpose of the Missouri Pacific in borrowing was to make advances on a cost basis to the NOTM, and that since the parent company occupies a fiduciary relationship to its subsidiary, it is required to pass on to the subsidiary the benefit of the compromise by allowing a similar retroactive reduction in interest on the amounts lent to the subsidiary. It is unnecessary to recite the facts in greater detail. The Commission has done so in its Report, Missouri Pacific Reorganization Proceedings, Volume LII, page 28618, et seq. Evidence on this question was excluded at the hearing, and petitioners made an offer of proof.

■ This inter-company debt was the subject of previous litigation. The validity of the debt was upheld by the Supreme

Court in Comstock v. Group of Institutional Investors, 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911. This decision is *res judicata* as to the validity of the debt. The petition does not question the action of the Missouri Pacific in setting the 5½ percent and 6 percent interest rates on the advances to NOTM at the time the advances were made. The only issue raised is the effect of the 1946 compromise on these interest rates.

The fiduciary relationship requires only that the parent company fix the terms of the advances to the subsidiary fairly. The parent company obviously takes a risk in making the advance. It is under no duty to make financing available to the subsidiary at an interest rate lower than the subsidiary could borrow elsewhere. The fairness of the rate of interest was in my opinion established by the Comstock case. If the findings in that case do not cover the matter, nevertheless it was an issue which could have been raised at that time, and cannot be raised now. In this connection, it should be noted that the indebtedness is evidenced for the most part only by unsecured notes, and interest rates of 5½ percent and 6 percent seem eminently reasonable.

As the Court said in Ewen v. Peoria & Eastern Railway Co., D.C., 78 F. Supp. 312, 316, certiorari denied, Income Bondholders of Peoria & E. R. Co. v. New York C. R. Co., 336 U.S. 919, 69 S.Ct. 642, 93 L.Ed. 1032, on which case the petitioners principally rely, the inter-company transactions must be fair and the test is "whether the proposition submitted would have commended itself to an independent corporation". The original advances, and the interest rates thereon, met this test. Clearly, the compromise of its debt by the parent company in no way affected or concerned the subsidiary. As stated above, the parent company is under no duty to lend to its subsidiary at the rate at which the parent can borrow, unless that happens to be the rate at which the subsidiary could borrow elsewhere. The petitioners' claim that the parent must make a retroactive reduction of interest on the subsidiary's debt to

it is exactly the converse of this statement. The Court finds that the alleged duty to pass on the benefit of the compromise by the Missouri Pacific does not exist, and the evidence in this regard was properly excluded.

Since the parent company fulfilled its fiduciary duty in fairly fixing the terms of the loan to the subsidiary, the latter can thereafter escape the terms of its obligation only by payment and discharge. In the case of the NOTM this would involve refunding of the inter-company debt. Petitioners allege that this could have been done at a lower rate of interest than the present rate. Since the question of past or present ability of the NOTM to refund is more directly concerned with the request for a discharge of that debtor from these proceedings, it will be discussed hereinafter.

The request for the discharge of the NOTM is, as the Interstate Commerce Commission said, a matter for the Court to determine. There is no doubt that the Court has jurisdiction to dismiss the proceedings if it finds that the NOTM can pay or otherwise satisfy its matured obligations and be able to meet its debts as they mature.

The Court's jurisdiction to dismiss the reorganization proceedings is not predicated on any specific provision of Section 77, but upon the inherent powers of the Court, as a Court possessing full equity powers to dismiss the proceedings when their purpose has been achieved. The Debtor's petition for reorganization in this case alleged that it was unable to meet its debts as they matured and desired to effect a plan of reorganization. This allegation was predicated on Section 77, sub. a, which provides: "Any railroad corporation may file a petition stating that it is insolvent or unable to meet its debts as they mature and that it desires to effect a plan of reorganization". It is thus clear that the basic fact which gave rise to the Court's jurisdiction in the first instance was the inability of the Debtor to meet its debts as they matured. It follows, therefore, that if, during the course of the reorganization

proceedings the Debtor becomes able to meet its debts as they mature, by refunding or otherwise, the proceedings should be dismissed.

Section 2, sub. a, of the Bankruptcy Act, 11 U.S.C.A. § 11, sub. a, provides that District Courts as courts of bankruptcy shall be vested "with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in proceedings under this Act". Section 2, sub. b, provides, in part, that "Nothing in this section contained shall be construed to deprive a court of bankruptcy of any power it would possess were certain specific powers not herein enumerated".

Section 77, sub. a, of the Bankruptcy Act provides that the Court " * * * shall have and may exercise in addition to the powers conferred by this section all the powers, not inconsistent with this section, which a Federal court would have had if it had appointed a receiver in equity of the property of the debtor for any purpose".

The general equity powers of the bankruptcy court have been recognized. In Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry. Co., 294 U.S. 648, 55 S.Ct. 595, 606, 79 L. Ed. 1110, the Supreme Court said: " * * * They [courts of bankruptcy] are essentially courts of equity, and their proceedings inherently proceedings in equity * * * ".

In Young v. Higbee, 324 U.S. 204, 65 S. Ct. 594, 599, 89 L.Ed. 890, the Court said: " * * * Courts of bankruptcy are courts of equity and exercise [essentially] all equitable powers unless prohibited by the Bankruptcy Act".

In ordinary bankruptcy proceedings it is settled that the proceedings will be dismissed when a bankrupt becomes solvent and pays, or otherwise satisfies or discharges, his debts. In re Public Industrials Corp., D.C., 53 F.Supp. 960; In re Vidor, D.C., 46 F.Supp. 468. It is also established that in an equity receivership proceeding the Court can dismiss the proceeding and restore the debtor's property to him when the debtor becomes able and offers to pay his outstanding debts. Milwaukee and Minnesota Railroad Co. and Fleming v.

Soutter, 2 Wall. 510. In proceedings under Section 77B (Chapter VIII) of the Bankruptcy Act, 11 U.S.C.A. § 207 (which is similar in language and purpose to Section 77), the cases hold that reorganization proceedings should be dismissed when it appears that the debtor has acquired sufficient assets to meet its obligations when they mature. Sword S. S. Line v. Vendramis, 2 Cir., 116 F.2d 665.

Proceedings under Section 77 of the Bankruptcy Act have been dismissed when it developed during the course of the proceedings that the debtors had become able to meet their debts as they matured. In the Missouri Pacific reorganization this Court entered an order dismissing the Missouri-Illinois Railroad Co. reorganization proceedings in 1944, where the Trustee of the Missouri-Illinois filed a petition to dismiss proceedings as to that company on the ground that the debtor was "in a position to meet its expenses of operation and its debts as they mature". Similarly, in Re Hoboken Manufacturers Railroad Co., D.C., 93 F. Supp. 576, the proceedings were dismissed where it appeared that all claims which had been filed against the debtor were either withdrawn or settled, and that as a result the debtor was no longer insolvent or unable to meet its debts as they matured. In Re St. Louis-Southwestern Railway, this Court entered an order dismissing the proceedings when it appeared that the debtor had sufficient assets to carry out a program of dismissal, which program contemplated full payment or discharge of all obligations of the debtor.

The proposal in the present case contemplates a refunding of a $40,-000,000 bond issue and a funding of a $20,-000,000 debt. In this memorandum the term "refund" includes the funding of the $20,000,000 debt. It is argued that this so-called refunding amounts to a reorganization which, under Section 77, can be achieved only by the approval by the Interstate Commerce Commission of a plan of reorganization. It is clear, however, that the contemplated action is not the equivalent of a Section 77 reorganization. There would be no change in capitalization

and the stockholders' rights would not be altered. If it is possible for the NOTM to refund its obligations and thereby become able to meet its debts as they mature, I think that the Trustee has a duty to take steps to achieve that end. To keep a debtor which is able, or which can become able by refunding, to meet its debts as they mature in a Section 77 proceeding would not be in accord with the policy of that Section and would be in violation of the Fifth Amendment.

The petition has been attacked on the ground that none of the petitioners have any standing which will permit them to bring this action. Some of the petitioners are stockholders of the NOTM. If that company can refund and thereby become able to meet its debts as they mature, clearly the common stock is of value and a stockholder, even though a minority holder, has such a status as will permit him to bring this suit.

The NOTM is in these reorganization proceedings because, as it is alleged in its petition filed in 1933, it was unable to meet its debts as they matured The burden of proof is on the petitioners to show that as a result of changed conditions the NOTM is now able to meet its debts as they mature. The petition prays for a discharge of the Gulf Coast Lines. The contention is that the NOTM can be made to be able to meet its debts as they mature by refunding, and that the subsidiaries are solvent except for inter-company debt which is "within the control of Gulf Coast Lines, subject to the requirements, if any, of regulatory authority". Consequently, the evidence was directed to the ability of the NOTM to refund.

The NOTM has a first mortgage of $40,615,900, on which interest is not in arrears. There exists a debt due its parent company of $10,565,000 principal amount, on which interest is accruing at the rates of 5½% and 6%, the total amount of interest due as of January 1, 1950, being $8,523,000. There are 148,329 shares of capital stock, 8,598 of which are publicly owned, the remainder being held by the Missouri Pacific.

The petitioners' first witness was Patrick J. McGinnis. He stated that NOTM's credit was impaired by five adverse factors, those being bankruptcy of the debtor, bankruptcy of the parent, the length of the proceedings, the fact that NOTM credit is not generally eligible for investments by banks, trust and insurance companies, and the fact that credit agencies for rating railroad securities will not rate obligations of bankrupt railroads as eligible for bank investments. Favorable factors, he said, were the record of earnings, efficiency of management, the expansion of the sulphur and citrus business in NOTM territory, and capital expenditures made during the bankruptcy period. He stated that if the five adverse factors were removed, he would form a group to bid on $60,000,000 of NOTM refunding bonds, the coupon not to exceed 3-½%, with a thirty-year maturity, and a sinking fund of ½ of 1%. This $60,000,000 issue would not in his opinion exhaust the borrowing power of the NOTM. A total of $85,000,000 was to be authorized, with authority to sell $60,000,000, the indenture providing that the remainder could be sold to the extent of 75% of new capital expenditures to plant. He did not have a firm commitment. In the opinion of this witness there would be no need for additional financing by the NOTM except for equipment financing, which would not be difficult; in the event of an emergency requiring additional funds temporary credit would be available from Texas banks.

Petitioners' second witness was William Wyer. His testimony in regard to the ability of the NOTM to refund and thereby become solvent was also directed to the advantages of being out of bankruptcy and the disadvantages of being in bankruptcy. Wyer first stated that the NOTM credit was adversely affected by bankruptcy proceedings. In an attempt to show that, absent bankruptcy, the credit of NOTM would be equal or superior to the credit of other Class I Railroads not in bankruptcy, an exhibit comparing statistics of NOTM with those for a number of Class I Railroads for the year 1948 was introduced. The exhibit contained the following data for the various railroads: operating rev-

enues; net railway operating income; amount available for fixed charges; fixed charges; net income; the ratio to operating revenues of (1) net railway operating income, (2) amount available for fixed charges, (3) fixed charges, and (4) net income; and the ratio available to fixed charges. As a whole, NOTM compared favorably with the other railroads shown. The exhibit was excluded and an offer of proof made.

Further testimony by Wyer on the adverse effects of bankruptcy was based on this exhibit and, consequently, was excluded and an offer of proof was made. The offer of proof states that the witness had drawn the following conclusions from the exhibit; that since the NOTM was in some respects comparable to certain other railroads, it could refund all or part of its debt at the same rate of interest at which the other railroads had borrowed; that by that comparison, if the NOTM were removed from bankruptcy it could refund at 3½% to 3¾%; that refunding at this rate would lower the NOTM's fixed charges; and that after removal from bankruptcy its credit would be eligible to banks, trusts and insurance companies.

Wyer also stated that if the NOTM were removed from bankruptcy it could finance equipment at rates from .2% to .25% less than it now pays, and that its condition would be improved by an annual saving of approximately $30,000 in bankruptcy expenses.

John Speed Elliott, one of the petitioners, testified that in order to refund, the following steps would have to be taken: first, the Trustee, or the management, would contact persons in the investment business to discuss the feasibility of the refunding; second, if it were decided that it was feasible, arrangements would have to be made with banks for an interim loan pending the sale of the bonds to the public; and third, persons who would bid on the bonds would have to be contacted and an attempt would have to be made to secure from them an expression of an intention to bid when the bonds should be offered. Elliott said that no firm commitment is ever made by a banker until the

bonds are ready to deliver. Elliott had letters from two firms which had expressed an interest in a proposed refinancing of the NOTM, provided that the Trustee should approach them with proper authority. The letters were excluded, and an offer of proof made.

Paul J. Neff testified that if the NOTM was refunded on the terms proposed by McGinnis and Wyer, further financial arrangements would have to be made in the near future. He thought that fixed charges, equipment obligations, expenditures for additions to road and improvements to existing equipment, improvements to the Houston Belt & Terminal Railway, and the purchase of additional freight cars, would require annual expenditures of $5,033,019, which is $333,010 in excess of the Commission's normal year's estimated earnings for the NOTM. The high ratio of debt to investment would, in Neff's opinion, present a difficult financing problem on maturity and "would seem to offer a fifty-fifty chance for another bankruptcy proceeding on maturity." He stated that the removal of the NOTM from bankruptcy, with the control of the stock retained by Missouri Pacific, would have a demoralizing effect on shippers and employees and on prospective industrial development on the railroad.

George M. Grinnell stated that the proposed refunding of the NOTM would result in a fixed interest debt that would be high in comparison to the depreciated investment in road and equipment. An exhibit showing the total fixed interest debt and percent of property investment for the New Orleans and a number of other railroads as of December 31, 1948, was introduced. The proposed NOTM refunding would result in a fixed interest debt in relation to property investment of 78%. Other railroads shown on the exhibit had from 10% to 44%. In his opinion, potential investors interested in the purchase of NOTM bonds would consider the relatively high fixed interest debt, though earning power in relation to debt would probably be their primary consideration. He testified that $60,000,000 was a large issue in relation to the general demand for railway se-

curities, and that it would be impossible to sell such an issue until the question of whether the NOTM would remain part of the System, or would be operated independently, was settled.

From the evidence of these witnesses, it cannot be said that the petitioners have sustained the burden of proof of the ability of the NOTM to refund. No prospective bidder with a firm commitment for the purchase of the proposed refunding bonds testified. All witnesses agreed that at this time no one would make a firm offer. One prospective bidder, McGinnis, stated that if five adverse conditions were removed he would form a group to bid on the proposed $60,000,000 issue. The following excerpts are from McGinnis' testimony:

On direct-examination:

"Q. (By Mr. Tralles) Are you willing to form a group to refinance these obligations? A. Yes, under certain circumstances.

"Q. And what would those circumstances be? A. That the five unfavorable factors which I consider technical be removed, leaving the four favorable factors. Under those circumstances I, my firm, my firm itself will form a group to bid on 60 million dollars worth of New Orleans, Texas and Mexico bonds, and in my opinion the coupon would not exceed 3½ percent."

On Cross-examination:

"Q. But you are not in a position now to guarantee to the Judge there will be a bid for a three and a half percent bond at par if he should dismiss these proceedings and the case gets around to the point where we could set up a sixty million dollar bond issue, are you? A. Under my conditions. In other words, naturally you are adopting my condition, too, that these five technical adverse problems are removed, and the road removed from bankruptcy.

"Q. In other words, your proposal is conditional—a lot of things have to happen before that you are ready to bid for the bonds? A. I have said that from the very beginning, sir. I would be perfectly happy to take the commitment if you give me, provide me with my conditions, I will give you a written commitment on the bonds at par on a three and a half percent basis."

It was thus made clear that the adverse conditions must be removed before McGinnis would bid.

The removal of the past record of bankruptcy and the removal of the Missouri Pacific from bankruptcy are two of these conditions. As has been pointed out, nothing can now be done to eliminate the long record of bankruptcy, and if the Missouri Pacific must be removed from bankruptcy before the NOTM can refund, it is an admission that the NOTM cannot refund. Moreover, satisfaction of the requirement of prior removal of the Missouri Pacific from bankruptcy would not only be impractical, but would require a new Commission Plan which would, in turn, cause further delay in these proceedings for all of the three principal debtors. Removal of the other three adverse factors can be accomplished only by removal of the NOTM from bankruptcy. In other words, the witness said removal of the NOTM from bankruptcy is a condition precedent to the ability to refund, but obviously ability to refund is a condition precedent to removal from bankruptcy, as the NOTM cannot meet its debts as they mature unless it can first refund. For these reasons alone the Court cannot attach much significance to McGinnis' testimony. Moreover, it does not appear that this witness was very familiar with sales of railroad bond issues in recent years. He stated that since January 1st, 1945, to date, only two railroads have sold securities, exclusive of equipment trusts, at competitive bidding, and that the face amount of the bonds would not exceed $100,000,000. Grinnell testified that in that period there were sixty issues, aggregating $1,989,354,000. Grinnell, also a broker, stated that it would be impossible to sell the proposed $60,000,000 issue on a competitive basis; and that "until the question of whether the New Orleans would remain as part of the System or be operated independently is settled * * * investors would be unwilling to purchase such a bond issue". To the evidence of McGinnis and Grinnell may be added that of Elliott, for-

merly a broker, who was of the opinion that the proposed issue could be sold.

The opinions of those who are in the business of bidding on railroad securities are, in my judgment, the most relevant and competent evidence in respect to this issue. I do not regard the evidence of McGinnis and Elliott as persuasive. It is argued that Grinnell's testimony is meaningless since the Missouri Pacific will continue to control the NOTM even if that Company is discharged from bankruptcy, and since he based his conclusions on the allegedly erroneous conclusions of Neff. The question of who will continue to control the NOTM is an issue raised by some of the petitioners in their objections to the Plan. The Plan must be approved by this Court and a decision of this Court must be affirmed on appeal before this issue can be determined; and Grinnell, as a prospective bidder, may base his refusal to bid on Neff's predictions, whether or not those predictions are erroneous. It is further argued that Grinnell's testimony is not conclusive, since there will be many brokers who will not bid. Information as to brokers who will not bid is of some value, but the Court is primarily interested in knowing if any will bid. No willing bidder was brought before the Court, with the exception of McGinnis, whose offer was so qualified as to be meaningless.

There is no dispute as to the advantages and disadvantages of bankruptcy, and of being out of bankruptcy. No doubt a discharge from bankruptcy by means of the proposed refunding would bring about an improved condition; particularly in the decrease of fixed charges, and a prospective bidder would doubtless consider the improved condition. Assuming that the NOTM would, after its discharge, continue to be operated as a part of the System and assuming that the Commission would approve the issuance of the new securities, the advantages of discharge do not seem sufficient to attract investors. The balance sheet for the NOTM shows a surplus deficit of $15,011,340.81 as of December 31, 1949. Current liabilities are about double the amount of current assets. Presumably no one would invest anything in the railroad except on the basis of exceptional earnings. The Gulf Coast Lines earnings available for interest averaged $4,959,146 for the 12-year period from 1937 through 1948, and $6,506,176 for the 7-year period from 1942 through 1948. The Commission estimated that the normal year's earnings would be $4,700,000. Potential investors will, no doubt, look for some assurance of continued solvency, and I cannot say that the earnings of the NOTM, particularly in view of all of the circumstances, would give them that assurance. The earnings of the NOTM have, for the purposes here under consideration, been considered as the equivalent of the earnings of the Gulf Coast Lines, in order to reflect the value of the stockholdings of the NOTM in its subsidiary companies comprising the Gulf Coast Lines.

The exhibit prepared by Wyer, which compared the NOTM with other Class I Railroads not in bankruptcy as of December 31, 1948, is not convincing. It does not attempt to show the background of the other Class I Railroads, and there are many factors other than those shown which would influence potential investors. Moreover, the year 1948 is the year of the highest earnings of the NOTM and the comparison is not fair in that respect. Wyer's testimony was based on this exhibit and is, therefore, no more convincing than the exhibit. I think that the exhibit and the testimony based upon it were properly excluded, as were Elliott's letters.

The Court holds that the petitioners have not sustained the burden of proof of the allegation of the ability of the NOTM to refund, and that the petitioners are not entitled to the relief prayed for. Findings of fact, conclusions of law, and an order in accordance with the views herein expressed may be submitted.

On Petition of the Independent Directors of the Missouri Pacific Railroad Company for an Order Determining that the Consolidation or Merger Prescribed in the Plan of Reorganization Certified by the Interstate Commerce Commission on January 11, 1950, is Unlawful, and for Other Relief.

The Plan of Reorganization prepared by the Interstate Commerce Commission

for the three principal debtors, Missouri Pacific Railroad Company, New Orleans, Texas & Mexico Railway Company and the International-Great Northern Railroad Company was certified to this Court for a hearing on January 11, 1950. The NOTM and I–GN are subsidiaries of the Missouri Pacific. The Plan provided that the three principal debtors should be reorganized as a single company, with a separate provision for separate incorporation of the I–GN, if necessary.

The Independent Directors filed a petition in this Court on February 24, 1950, asking for an order determining that the consolidation or merger described in the said Plan was unlawful. At the hearing, various motions were directed to the petition and the evidence adduced under it. These motions were based on the following grounds: (1) that the petition is a duplication of some of the Independent Directors' objections to the plan of reorganization; (2) that the so-called petition does not comply with Rule 8(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.; and (3) that the petition does not allege that the petitioners have any claim or interest which would permit intervention under Rule 24 of the Rules of Civil Procedure. The disposition of the petition hereinafter made renders it unnecessary to rule on these motions.

The gist of the petition is essentially an attack upon the Plan of Reorganization, a claim that the Commission has acted without legal authority. The prayer requests an order determining that the Commission has acted beyond its "power, jurisdiction, and authority" in requiring the consolidation or merger; that the Plan is in that respect unlawful; and that the Plan be returned to the Commission.

 Sections 77 subs. d and e, of the Bankruptcy Act provide for certification by the Commission of a plan which has been approved by it to the Court, and for approval or disapproval of the plan by the Judge. These sections provide an exclusive method for review of a plan to determine whether the plan should be approved, or disapproved and returned to the Commission. For another situation in which Section 77 was held to provide the exclusive method for review of a plan by the Court, see Chicago & N. W. Ry. Co. v. U. S., D.C., 52 F.Supp. 65, affirmed 320 U. S. 718, 64 S.Ct. 369, 88 L.Ed. 422. Assuming Section 77 not to be exclusive in this regard, the Code requires that a proceeding in the District Courts to " * * * set aside in whole or in part any order of the Interstate Commerce Commission * * *" shall be brought " * * * against the United States." 28 U.S.C.A. §§ 2321 and 2322. Jurisdiction is not alleged in the complaint nor does it appear anywhere in the record. For these reasons the petition is dismissed for want of jurisdiction.

## In re BEGGS.